**UNITED STATES of America, Plaintiff,**

v.

**0.08246 ACRES OF LAND, more or less, situated in the City of Allentown, Pennsylvania; Citizens of Lehigh County; County of Lehigh; Commonwealth of Pennsylvania; and Unknown Owners, et al., Defendants.**

Civ. A. No. 94–CV–1443.

United States District Court,
E.D. Pennsylvania.

June 2, 1995.

Lois W. Davis, Asst. U.S. Atty., Philadelphia, PA, for government.

Richard F. Stevens, Allentown, PA, for claimant Commonwealth Realty Co.

### DECISION AND ORDER

VAN ANTWERPEN, District Judge.

On March 1, 1994, plaintiff United States filed a condemnation complaint and declaration of taking on behalf of the United States Postal Service to take control and possession of a 40 feet by 90 feet parcel of land in Allentown, Pennsylvania, upon which the government is building a federal courthouse. The condemned property is bounded on two of its four sides by public streets (Fifth Street and Hamilton Street), on a third side by a U.S. Postal Office, and on the fourth side by the Commonwealth Building, owned by claimant Commonwealth Realty.

Commonwealth Realty does not dispute the government's right to condemn the property but claims that it has a compensable ownership interest because it is a successor in title to a landowner who had an ownership interest in the condemned property. The primary basis for this contention is an agreement signed in 1864 by five landowners ("1864 Agreement"), one of whom is a predecessor in title to Commonwealth Realty. The five signatories agreed in the 1864 Agreement not to erect buildings or other structures on the now condemned property and also agreed to otherwise maintain the property in certain ways, thus implying their ownership rights in it. Although its predecessor in title did not own any part of the condemned property,[1] claimant maintains that the other four signatories had ownership interests in it and the 1864 Agreement created reciprocal easements appurtenant for light and air and ancient view. It is Commonwealth Realty's position that building the federal courthouse is a violation of this easement and claimant thus seeks to be compensated accordingly.

The government contends that the condemned property is public land commonly referred to as "Court House Square," and at no time was any portion of it owned by any of the five signatories to the 1864 Agreement. It relies upon a decision by Judge Davison of the Lehigh County Court of Common Pleas in *County of Lehigh v. Yundt, et al.*, 35 Lehigh Law Journal 436 (Ct.Comm. Pleas, 1974), which discussed the ownership interests of the exact same property that was condemned and held that the title to the property had been in the public since 1762.[2]

---

1. Claimant maintains that its predecessor in title owned a small 30 by 40 foot tract of land next to the condemned property and that this small tract was subject to the 1864 Agreement and is part of the area referred to by the government as "Court House Square." This small tract is not now a portion of the land which was condemned by the United States.

2. The *Yundt* case was a quiet title action brought by the County of Lehigh in 1974 to determine whether it had rights superior to those of George Yundt, the owner of the realty to the immediate south of the condemned property. The court analyzed the same agreement signed in 1864 upon which claimant now relies to establish its ownership interest. However, neither party to this action was a party to the *Yundt* action, and the decision of that court is thus not binding upon them.

Consequently, the government maintains, no easement can exist since the owner of the land, i.e., the public, was not a party to the 1864 Agreement.

A hearing was held before this court in Easton, Pennsylvania, on January 19, 1995. At the hearing, the government presented the testimony of two expert witnesses. Through its first expert, a professional land surveyor, the government presented a chronological survey of deed plots of property fronting along the condemned property from 1816 to 1927, indentures conveying the properties, and two ancient maps. The expert testified that the documents establish that the condemned property was public property before, during, and after 1864. The second expert, a real estate title expert, testified that a chain of title search had revealed no evidence of ownership of the condemned property by any of the five signatories to the 1864 Agreement.

The claimant presented the testimony of Joel B. Wiener, Esquire, one of the two general partners of Commonwealth Realty, who testified that a review of histories and anthologies of the City of Allentown at both the Allentown Public Library and the Lehigh County Historical Society had turned up no references to public land known as "Court House Square." Through this witness the claimant also presented several postcards and pictures which depict the condemned property as fenced in at various times after 1864, thus indicating, claimant contends, private ownership.

Following the hearing, the parties filed proposed findings of fact and conclusions of law,[3] all of which have been duly considered by this court. Based on the testimony presented at the hearing and the parties' briefs, we now render our decision.

## I. FINDINGS OF FACT

### A. *Parties and Jurisdiction*

1. Plaintiff is the United States of America.

2. Claimant is Commonwealth Realty, a Pennsylvania general partnership, of which Howard Wiener, Esquire and Joel B. Wiener, Esquire are general partners, with offices located at Suite 400, Commonwealth Building, Allentown, Pennsylvania.

3. Plaintiff brought this action in accordance with the Act of Congress approved August 1, 1888 (25 Stat. 357 c. 728), as amended (40 U.S.C. § 257); the Act of February 26, 1931 (46 Stat. 1421, c. 307) (40 U.S.C. § 258a); the Federal Property and Administrative Services Act of 1949, approved June 30, 1949 (63 Stat. 377), as amended, subject to Public Law 97–51.

4. Jurisdiction exists pursuant to 40 U.S.C. § 258(a).

### B. *Condemnation Action*

5. On March 1, 1994, the United States of America filed a Complaint in Condemnation and a Declaration of Taking with respect to 0.08246 acres of land, more or less, located at the southwest corner of Fifth and Hamilton Streets, Allentown, Pennsylvania. The United States has begun building a new federal courthouse at this site. (Complaint in Condemnation).

6. The condemned property is the easterly 90 feet by 40 feet portion of the 120 feet by 40 feet plot that the government refers to as "Court House Square." It extends from Fifth Street 90 feet along the south side of Hamilton Street at a width of 40 feet. It is bordered on the north by Hamilton Street, on the south by property owned by the United States Postal Service, on the east by Fifth Street, and on the west by the property of defendant Commonwealth Realty. (Complaint in Condemnation, Schedules A and B).

7. Prior to the condemnation, the condemned property served as an open air park, containing only two monuments and a park bench.

8. On March 18, 1994, an Order for Delivery of Possession was entered, granting

---

**3.** We note that claimant Commonwealth Realty in its Proposed Findings of Fact wholly disregarded our Order of March 19, 1995, which directed defense counsel to respond sequentially to plaintiff's Proposed Findings of Fact, indicating the areas of agreement and disagreement, as well as our oral direction to the same effect.

plaintiff United States possession of the condemned property.

9. Claimant Commonwealth Realty does not dispute the plaintiff's right to take and possess the condemned property. (N.T. at 172).

## C. Division of Land Prior to 1864 Agreement

10. The Original Plan of Allentown, dated 1762 and prepared for William Allen[4] as maintained in the records of the Lehigh County Historical Society ("the William Allen Map of 1762"), indicates that at that time there were three lots in the southwest corner of Fifth[5] and Hamilton Streets, Lots 165, 179, and 193, all owned by Ann Penn Greenleaf.[6] (N.T. at 23–25, 81).

11. Lot 165 was the most easterly of the three original lots and was subsequently divided into three subdivisions. At the time of the 1864 Agreement, these three subdivisions formed 502, 504, and 506 Hamilton Street. (Government Ex. 1, p. 3; N.T. at 32).

12. Lot 179, the middle lot, was subsequently divided into two subdivisions. The easterly subdivision of these two at the time of the 1864 Agreement formed 508 Hamilton Street. (Government Ex. 1, p. 3; N.T. at 32).

13. Lot 193, the most westerly of the three original lots, was subsequently divided into two subdivisions. At the time of the 1864 Agreement, the easterly subdivision of Lot 193, along with the westerly subdivision of Lot 179, together formed 510, 512, and 514 Hamilton Street. The westerly subdivision of Lot 193 formed 516 and 518 Hamilton Street. (Government Ex. 1, p. 3; N.T. at 32).

## D. 1864 Agreement

14. The 1864 Agreement was between Margaret Wilson Saeger, owner of 510, 512, and 514 Hamilton Street, Henry C. Longnecker, owner of 508 Hamilton Street, Samuel Saylor, owner of 506 Hamilton Street, Hetty Unger, owner of 504 Hamilton Street, and Charles C. Seagreaves, owner of 502 Hamilton Street. (N.T. at 2; Government Ex. 2).

15. Defendant Commonwealth Realty claims an interest in the 1864 Agreement as a successor in title to Margaret Wilson Saeger. (N.T. at 35).

16. In the 1864 Agreement, the signatories promised to each other to not erect buildings or other structures and to otherwise maintain the area which includes the condemned property in certain ways:

"[W]e the undersigned owners of the Vacant ground on the South side of Hamilton Street opposite the Court House ... do hereby agree each respectively to enclose with a fence so much as the respective fronts of our several lots on the aforementioned Vacant Space and also each to erect one half of the Partition Fences of our respective lots as aforesaid and also to maintain for all time to come our said respective front fences and our portions of said Partition fences.... It being fully understood that said Tenant Space is to be used for no other purpose than door yards which each respectively may ornament with grass, shrubbery & trees ... but nothing in this agreement to authorize the erection upon said space of any buildings or other structures calculated to impair its beauty or ancient view from the buildings on said lots.... [W]e bind ourselves each the one to the other four and each of our respective heirs Executors and Administrators & assigns by these presents Uniting our hands and seals ..."

(Government Ex. 1, p. 58).

17. The 1864 Agreement was recorded in the Office of the Recorder of Deeds in and for Lehigh County in Volume 7, p. 316, on August 31, 1864. (Government Ex. 1).

18. Claimant Commonwealth Realty claims that the 1864 Agreement evidences the fact that the signatories of the 1864 Agreement were owners of the area the government refers to as "Court House Square," which includes the now condemned property.

---

4. William Penn Allen founded Northamptontowne in 1742. In 1811 it became the Borough of Northampton, and in 1838, the name was changed to Allentown.

5. At the time, Fifth Street was known as Margaret Street.

6. Ann Penn Greenleaf was the grand-daughter of William Penn Allen.

19. Claimant maintains that, although its predecessor in title did not own any portion of the now condemned property, it nevertheless has an ownership interest in it because the effect of the 1864 Agreement was to create reciprocal easements appurtenant respecting light, air and ancient view.

20. Plaintiff United States claims that the signatories never had an ownership interest in the condemned property because "Court House Square" was public property in 1864. Consequently, it contends that the 1864 Agreement was merely a personal agreement between the private parties that had no legal bearing on the condemned property.

### E. Survey of Land Surrounding Condemned Property

21. Plaintiff United States hired a professional land surveyor, Richard W. Czop, to conduct a chronological survey of deed plots of property owners fronting along the condemned property from 1816 to 1927. Mr. Czop both testified orally as an expert at the hearing on January 19, 1995, and compiled his results in a survey entitled, "Report on the Existence and Location of Court House Square and Adjoining Property Owners during the year 1864" ("the Report"), which was admitted into evidence. (Government Ex. 1).

22. All conveyances from 1816 to 1927 of the relevant properties are laid out in a flow chart on page four of the Report.

23. The Report generally concludes that at no time from 1816 to 1927 did any of the owners of the adjacent properties have title to the condemned property. (Government Ex. 1, p. 4; N.T. at 49).

### i. Conveyances Up to and Including the Signatories of the 1864 Agreement

24. The distance from the southern edge of the condemned property to the northern edge of Maple Street, the street that runs parallel to Hamilton Street and intersects Fifth Street, is 185 feet. The distance from the southern edge of Hamilton Street to the northern edge of Maple Street is 225 feet. (Government Ex. 1, pp. 2–3).

25. Lot 165, which eventually encompassed 502, 504, and 508 Hamilton Street, was to the immediate south of the condemned property and measured 185 feet in length. (Government Ex. 1, pp. 2–3).

26. Lot 179, which eventually encompassed 508 and 510 Hamilton Street, also was to the immediate south of the condemned property and measured 185 feet in length. (Government Ex. 1, pp. 2–3).

27. Lot 193, which eventually encompassed 512, 514, 516, and 518 Hamilton Street, was to the immediate west of the condemned property and measured 225 feet in length. (Government Ex. 1, pp. 2–3).

28. It is the position of the plaintiff United States that only 185 feet in length of property was transferred in all the conveyances up to and including those to the signatories of the 1864 Agreement who possessed property derived from Lots 165 and 179, thus evidencing the fact that the conveyors did not intend to convey any part of the condemned property.

29. In 1830, Ann Penn Greenleaf conveyed Lot 165 in its entirety to Andrew Krauss. The measurement of the property conveyed was 60 feet by 185 feet. (Government Ex. 1, p. 7).

30. In 1843, Lot 165 was divided into thirds and conveyed equally to Leah Heist (506 Hamilton Street), George S. Krauss (504 Hamilton Street), and Samuel Krauss (502 Hamilton Street). The conveyances to Leah Heist and Samuel Krauss conveyed property which measured 20 feet by 185 feet each. The deed conveying one third to George S. Krauss was not found. (Government Ex. 1, pp. 8, 18; N.T. at 45).

31. In 1858, an Agreement to Size of Lots was entered into between the owners of the three subdivisions of Lot 165. All three subdivisions were sized as measuring 185 feet in length. (Government Ex. 1, p. 9).

32. In 1816, Lot 179 was divided into two equal parts. The easterly one-half was conveyed to John Nonnemacher and the westerly one-half to Charles L. Hutler. Both conveyances were for land measuring 30 feet by 185 feet. (Government Ex. 1, pp. 30, 41; N.T. at 46).

33. The easterly one-half of Lot 179 (508 Hamilton Street) was subsequently conveyed to William Blumer in 1847, Charles VonTagan, also in 1847, and Lesher Tuxler in 1849. All three conveyances described the conveyed property as measuring 30 feet by 185 feet. (Government Ex. 1, pp. 31–33; N.T. at 46). The westerly one-half of Lot 179 was later conveyed to Henry Wilson. (Government Ex. 1, p. 42).

34. Conveyances to Seagreaves, Unger, Saylor, and Longnecker, the owners of 502, 504, 506, and 508 Hamilton Street in 1864, respectively, described the property being conveyed to each as measuring 185 feet in length. (Government Ex. 1, p. 4).

35. The last recorded conveyance prior to 1864 to Charles Seagreaves of 502 Hamilton Street (the easterly one-third of Lot 165) conveys a plot which is 185 feet in length between Hamilton and Maple Streets. (N.T. at 33; Government Ex. 8).

36. The last recorded conveyance prior to 1864 to L.P. Unger of 504 Hamilton Street (the middle one-third of Lot 165) conveys a plot which is 185 feet in length between Hamilton and Maple Streets. (N.T. at 33–34; Government Ex. 10).

37. The last recorded conveyance prior to 1864 to Samuel Saylor of 506 Hamilton Street (the westerly one-third of Lot 165) conveys a plot which is 185 feet in length between Hamilton and Maple Streets (N.T. at 34; Government Ex. 7).

38. Prior to 1864, the recorded conveyances of Lot 165 do not show a transfer of the condemned property. (N.T. at 45–46).

39. The last recorded conveyance prior to 1864 to Henry C. Longnecker of 508 Hamilton Street (the easterly one-half of Lot 179) conveys a plot which is 185 feet in length between Hamilton and Maple Streets. (Government Ex. 9).

40. Prior to 1864, the recorded conveyances of the easterly one-half of Lot 179 do not show a transfer of the condemned property. (N.T. at 46).

41. There is no recorded conveyance prior to 1864 of the property originally known as Lot 165 nor the easterly one-half of the property originally known as Lot 179 (the Seagreaves, Unger, Saylor and Longnecker properties) which conveys more than 185 feet between Hamilton and Maple Streets. (Government Ex. 1, p. 4).

42. The last recorded conveyance prior to 1864 to Henry Wilson of the westerly one-half of Lot 179 conveys a plot which is 185 feet in length between Hamilton and Maple Streets. (Government Ex. 12).

43. The last recorded conveyance prior to 1864 to Henry Wilson of the easterly one-half of Lot 193 conveys a plot which is 225 feet in length between Hamilton and Maple Streets. (Government Ex. 1, p. 4).

44. Margaret Wilson Saeger obtained title to the westerly one-half of Lot 179 and the easterly one-half of Lot 193 through the Will of her deceased husband Henry Wilson, which was probated in 1826.[7] (N.T. at 35, 43; Government Ex. 1, p. 4).

45. The last recorded conveyances prior to 1864 to Henry Wilson of the easterly one-half of Lot 193 and the westerly one-half of Lot 179 do not show a transfer of the condemned property. (N.T. at 47).

46. By a Deed in Trust dated and recorded September 24, 1839, Joseph K. and Margaret Wilson Saeger conveyed her interest in the property inherited from Henry Wilson to John Groft as trustee. (N.T. at 142; Government Ex. 14).

47. The Deed in Trust from the Saegers to John Groft conveyed property that was 60 feet by 230 feet. (Government Ex. 1, pp. 4, 44).

48. When Margaret Saeger signed the 1864 Agreement on August 31, 1864, she was not the record title holder of the westerly one-half of Lot 179 nor the easterly one-half of Lot 193. (N.T. at 142; Government Ex. 14).

49. There is no recorded transfer of the condemned property to any of the signatories of the 1864 Agreement. (N.T. at 44–45).

---

7. Sometime between 1826 and 1839, the former Margaret Wilson married Joseph K. Saeger and became Margaret Saeger.

### ii. Conveyances After 1864 Agreement

50. The conveyance from Charles Seagreaves to William H. Ainey of 502 Hamilton Street (the easterly one-third of Lot 165) conveys a plot which is 185 feet in length. (Government Ex. 1, pp. 4, 12).

51. The conveyance from L.P. Unger to William H. Ainey of 504 Hamilton Street (the middle one-third of Lot 165) makes reference to a previous agreement to size lots made between the owners of the subdivisions of Lot 165. The referenced agreement states that the middle one-third of Lot 165 is 185 feet in length. (Government Ex. 1, pp. 4, 9, 16).

52. Following his death, Samuel Saylor's property was conveyed by will to Eliza Woolever and her children. 506 Hamilton Street (the westerly one-third of Lot 165) was then subdivided and conveyed in various deeds back and forth amongst the Woolever children. (Government Ex. 1, pp. 4–5).

53. The various conveyances amongst the Woolever children conveyed property that was 230 feet in length. However, in 1898, all the subdivisions which had previously formed 506 Hamilton Street were, for the first time, conveyed outside the Woolever family to Robert E. Wright. These conveyances all conveyed plots which are 185 feet in length. (Government Ex. 1, pp. 4–5).

54. The conveyance from the administrator of Henry Longnecker's estate to Edmund J. More, Esquire of 508 Hamilton Street (the easterly one-half of Lot 179) conveys a plot which is 185 feet in length. (Government Ex. 1, pp. 4, 35).

55. In 1879, 508 Hamilton Street was conveyed by the Sheriff of Lehigh County to Mary J. Longnecker and in 1882 she conveyed to Samuel Lewis. Both conveyances convey plots which are 30 feet by 185 feet. (Government Ex. 1, pp. 36–37).

56. The conveyance from the administrator of Margaret Saeger's estate to F.A.R. Baldwin of 510, 512, and 514 Hamilton Street (the sum of the westerly one-half of Lot 179 and the easterly one-half of Lot 193) conveys a plot which is 230 feet in length. (Government Ex. 1, pp. 4, 45).

57. The conveyance from the administrator of Margaret Saeger's estate to F.A.R. Baldwin also states that the intent is only to convey what Henry Wilson had. (N.T. at 59–60).

### iii. Boundary References in the Indentures

58. All of the deeds recording conveyances to the signatories of the 1864 Agreement either make reference to "Court House Square" or to a "public square" as a boundary.

59. The conveyance to Charles Seagreaves of 502 Hamilton Street makes the following reference: ".... along a public square opposite the Court house on Hamilton Street...." (Government Ex. 8, line 9 from bottom; N.T. at 38–39).

60. The conveyance to L.P. Unger of 504 Hamilton Street makes the following reference: ".... on the North by said Court house Square on the West.... in front-on said Court house Square." (Government Ex. 10, lines 13–16 from top; N.T. at 40–41).

61. The conveyance to Samuel Saylor of 506 Hamilton Street makes the following reference: ".... bounded on the north by courthouse square...." (Government Ex. 7, lines 21–22 from top; N.T. at 37–38).

62. The conveyance to Henry Longnecker of 508 Hamilton Street makes the following reference: ".... on the north by said Court House Square...." (Government Ex. 9, line 15 from top; N.T. at 39–40).

63. The conveyance of the westerly one-half of Lot 179 to Henry Wilson makes the following reference: ".... to the South West corner of the Court house Square...." (Government Ex. 12, line 11 from top; N.T. at 41–43).

64. Some of the conveyances from the signatories of the 1864 Agreement to subsequent owners, however, state that Hamilton Street is a northern boundary. (N.T. at 59).

65. The conveyance from L.P. Unger to William H. Ainey of 504 Hamilton Street makes the following reference: ".... and bounded on the north by said Hamilton Street...." (N.T. at 61).

66. The same conveyance from Unger to Ainey also later makes the following reference: ". . . . A more accurate description and dimension thereof are given on a certain agreement dated March 31, 1858 between the heirs of Andrew Krauss. . . . Meeting the same premises which David Krauss by deed dated April 7, 1858, duly executed and recorded in the deed book volume 23 as originally written." (N.T. at 64, 115). The dimensions that were set forth in the agreement referenced above indicated a length of 185 feet for the said property. (Government Ex. 1, pp. 4, 9; N.T. at 118).

67. The conveyances amongst the Woolever children of the various partitions of 506 Hamilton Street make reference to Hamilton Street as the northern boundary of their property. (N.T. at 67).

68. However, the conveyances from the Woolever children to Robert E. Wright of all the partitions of 506 Hamilton Street also make the following reference: ". . . . bounded on the north by Hamilton Street, or Courthouse Square on the south by Maple Street, . . . . Being property number 506 Hamilton Street in the City of Allentown, county and state aforesaid containing in front on the Hamilton Street twenty two and a half feet more or less and a depth of equal width 230 feet if measured from the south side of Hamilton Street or 185 if measured from the front house line on said Court house Square. . . ." (N.T. at 107).

69. The conveyance from the administrator of Longnecker's estate of 508 Hamilton Street to More makes the following reference: ". . . . bounded on the north by said Hamilton Street." (N.T. at 70).

70. The conveyance from the administrator of Margaret Saeger's estate to F.A.R. Baldwin makes the following reference: ". . . . and on the north by said Hamilton Street. . . ." (N.T. at 76).

F. *Ancient Documents*

71. The William Allen Map of 1762 shows a line going through Lots 165 and 179 in an east-west direction, dividing what appears to be the condemned property from the remain-der of Hamilton Street. (Government Ex. 5; N.T. at 26).

72. Plaintiff's expert, Richard W. Czop, testified that he believes that the insertion of this line represents the subdivision of the condemned property from Lots 179 and 165, signifying the creation of the area referred to as "Court House Square." (N.T. at 29).

73. Mr. Czop also testified that it is unclear exactly when the line was added to the map, but that it is his belief that it was done sometime after 1762 and before 1842. He also testified that such additions and changes are routinely made on such maps as time goes on. (N.T. at 27).

74. The 1842 Jarrett Map, as maintained in the records of the Lehigh County Historical Society, depicts an offset at the southwest corner of the Hamilton Street/Margaret Street intersection, which appears to correspond to the line drawn across the William Allen Map of 1762. (Government Ex. 6; N.T. at 30).

75. Mr. Czop testified that he believes that this offset on the 1842 Jarrett Map depicts a public right-of-way off Hamilton Street, representing the condemned property as part of public property. (N.T. at 31, 123).

76. Claimant's only witness, Joel B. Wiener, testified that he had searched histories and anthologies of the City of Allentown in both the Lehigh County Historical Society and the Allentown Public Library and found no reference in any of these to a "Court House Square." (N.T. at 175–78).[8]

77. It is claimant's contention that the condemned property was fenced in, pursuant to the 1864 Agreement, soon after it was signed, thus indicating the signatories' ownership interest in it. (N.T. at 181).

78. Claimant presented ancient postcards and pictures which depicted the condemned property as being fenced in at various dates after 1864, including 1881, 1904, and 1906. (Defense Exs. 1, 2, 3).

79. Mr. Wiener testified that the fences were removed in 1943 for the war effort. (N.T. at 181).

---

8. This court permitted Mr. Wiener to testify pursuant to Fed.R.Evid. 803(7).

80. Claimant also presented a picture, taken as part of an old appraisal of the Commonwealth Building in 1957, which defendant contends depicts the separate shoveling of the walk in front of the condemned property, thus indicating its private ownership at that time. (Defense Ex. 4; N.T. at 183).

### G. *Chain of Title Search*

81. Plaintiff United States hired a real estate title expert, Thomas M. Croke, Esquire, to conduct a title search of the land surrounding the condemned property. (Government Exs. 13 and 14).

82. Mr. Croke commissioned a chain of title search of the land upon which the United States Post Office now sits, extending back sixty years plus the years surrounding the 1864 Agreement. (N.T. at 138).

83. Based on this title search, as well as his review of the ancient maps, the deeds referenced in the Report, a current assessment map, current assessments for the Commonwealth Realty Building, and the *Yundt* decision, expert Croke testified that it is his belief that in 1864 the condemned property was owned by the public, not the signatories to the 1864 Agreement, because it was not in their chain of title. (Government Ex. 14; N.T. at 137–141).

### H. *Yundt decision*

84. In *County of Lehigh v. Yundt et al.,* 35 Lehigh Law Journal 436 (Ct.Comm.Pleas, 1974), the Court of Common Pleas of Lehigh County was presented with the task of deciding the ownership of the same condemned property that is the subject of the case at bar. The *Yundt* case was a quiet title action brought by the County of Lehigh to determine whether it had rights superior to those of George Yundt, then owner of the property to the immediate south of the condemned property. Judge Davison traced the history of the now condemned property, utilizing the same ancient maps presented as evidence in the case at bar and the services of a real estate title expert. The court also reviewed a series of conveyances, dating back to 1812, for property located at the southwestern corner of Fifth and Hamilton Streets as well as the same 1864 Agreement upon which defendant now relies. (Government Ex. 3).

85. On February 26, 1974, Judge Davison found that title to the same condemned property at issue here resided in the public, and that Lehigh County, although not vested with title or estate in the parcel, had the right to control and regulate it in the interest of the public. (Government Ex. 3).

86. Since neither of the parties to this action was a party in *Yundt* or in privity with the parties in that case, the *Yundt* holding does not have res judicata nor collateral estoppel effect on their present claims.

87. Until the United States condemned the property in 1994, it remained an open air park.

## II. DISCUSSION

We note initially that there is no dispute as to the ownership of the 30 feet by 40 feet tract of land that lies to the immediate west of the condemned property. Although the government contends that this tract was a part of the area referred to as "Court House Square," the tract is not required to construct the new courthouse and the government has elected not to condemn it. Thus we need not decide its ownership. What is at issue here is whether the 1864 Agreement created reciprocal easements appurtenant for light, air and ancient view and, if so, whether plaintiff has violated these easements by constructing a federal courthouse.

It is the government's position that both the *Yundt* decision and the evidence presented at the hearing regarding the chain of title of the surrounding properties dictate an initial finding by this court that ownership of the now condemned property was in the public in 1864. If that finding is reached, they maintain that the issue of whether any easement was created by the 1864 Agreement need not even be reached since the owner of the condemned property, the public, was not a party to it. Consequently, the public's successor in interest, the federal government, would not be bound by the Agreement. Claimant contends that the *Yundt* decision was wrongly decided and should thus be overruled by this court. The basis for this

contention is its belief that vital evidence supporting the proposition that ownership of the condemned property was in the 1864 signatories was not available to the *Yundt* court but was presented at our hearing of this matter. Peculiarly, however, in the alternative, claimant contends that the *Yundt* decision actually benefitted Commonwealth Realty since, in defense counsel's opinion, the *Yundt* court held that no buildings or structures could be built upon the condemned property. It was only when the government began to build the federal courthouse on the condemned property, claimant maintains, that the easement was violated.

■■■ The government is correct in its statement of the law that if we find that ownership of the condemned property was in the public in 1864 the issue of what type of easement, if any, was created by the 1864 Agreement would be moot. *See Baptist Church v. Urquhart*, 406 Pa. 620, 178 A.2d 583 (1962) (defendants cannot reserve easements across land they do not own). Although Judge Davison's thorough and erudite analysis of the ownership interests of the condemned property in *Yundt* led to that court's holding that ownership of "Court House Square" has been in the public since 1762, we cannot accord that opinion any res judicata effect because of the variance in the parties. *See* 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4448 et. seq. (parties to a prior action are bound and nonparties are not bound); *Cramer v. Gen. Tel. & Elect. Corp.*, 582 F.2d 259 (3d Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979) (before a

judgment can be given res judicata effect, both the parties and issues in the prior and subsequent suits must be identical). Moreover, since there is no evidence of privity between the parties in the present action and the parties in the prior action, collateral estoppel would also not apply. *See Edmundson v. Borough of Kennett Square,* 4 F.3d 186 (3d Cir.1993) (one of prerequisites to invoking claim preclusion is that same persons or their privies are parties to the litigation).[9] Accordingly, we must independently decide whether in 1864 ownership of the condemned property was in the public or the signatories of the 1864 Agreement.

With regard to this question, it is the position of claimant Commonwealth Realty that the language of the 1864 Agreement itself evidences the fact that the signatories were the owners of what is now the condemned property. It supports this conclusion with postcards and pictures which depict the condemned property as being fenced in at various times after 1864, thus indicating private ownership. Finally, it contends that a review of the histories and anthologies of Allentown reveals no reference to an area known as "Court House Square."

Plaintiff United States contends that the now condemned property was public land before, during, and after 1864 known as "Court House Square." Its primary support for this conclusion is the Report compiled by professional land surveyor Richard W. Czop which traces the chains of title of the properties of the signatories of the 1864 Agreement between 1816 and 1927. The government also relies upon two ancient maps which it

---

9. There is some support in case law for the theory that issue preclusion may be asserted in a later case with different parties without privity if the issues were well litigated by a party who had a close "identity of interests" with the person to be bound in the subsequent litigation. Upon examination of the facts of this case, however, we cannot find that there is enough "identity of interests" between the parties in the present action and those in *Yundt* to support such a theory of "virtual representation." *See Kerr–McGee Chem. Corp. v. Hartigan,* 816 F.2d 1177 (7th Cir.1987); *see also Moldovan v. Great Atlantic & Pacific Tea Co., Inc.,* 790 F.2d 894, 899 (3d Cir.1986) ("It is the identity of interests that determines the due process question, not, ... the identity of issues").

The peculiar need for finality in issues of property law has also led many courts to stray from the traditional rule that nonparties to a prior action are not bound by its ruling. However, the general rule with regard to such cases appears to be that while persons holding successive interests in the same property can preclude each other, persons holding concurrent interests, as is the case here, ordinarily do not preclude each other. The rationale behind this rule is that "[p]reclusion is extended or denied in an effort to protect conflicting property interests rather than an effort to implement concepts of participation or representation." 18 Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction § 4448.

maintains depict the separation of the area known as "Court House Square" from Lots 163 and 179.

In its most simplified form, the case before us is essentially a boundary dispute. Plaintiff asserts that the properties of four of the signatories of the 1864 Agreement (Seagreaves, Saylor, Longnecker, and Unger) measured 185 feet in length each, running from the southern boundary of "Court House Square" to the northern edge of Maple Street. Claimant Commonwealth Realty, however, contends that the properties of these four signatories measured 225 feet in length each, extending from the southern edge of Hamilton Street to the northern edge of Maple Street. Both parties acknowledge that there is no recorded deed conveying title to any portion of the area referred to as "Court House Square" to any of the signatories of the Agreement.

▮ Under Pennsylvania law,[10] the primary function of a trial court resolving a boundary dispute is to ascertain the intent of the parties at the time of the original subdivision of a tract of land. *Pencil v. Buchart,* 380 Pa.Super. 205, 551 A.2d 302, 305–06 (1988); *see also Yoho v. Stack,* 373 Pa.Super. 77, 540 A.2d 307 (1988) (in a boundary dispute, survey based on reconstruction of original subdivision plan from which the parties' properties were sold, and on other deed descriptions, was properly adopted over survey based on a tree-fence line not referred to in any of the deeds). Parties to a boundary dispute may present a wide range of evidence in order to prove intent. Generally, any deed or grant having a tendency to identify and to fix a disputed boundary is admissible in evidence. *See* 11 C.J.S. Boundaries § 112. Furthermore, "[m]aps, surveys, monuments, pedigree and even reputation evidence are admissible to establish boundaries, and boundaries may be established by circumstantial as well as by direct evidence." *Hostetter v. Commonwealth.,* 367 Pa. 603, 80 A.2d 719 (1951); *see also Mosher v. Com.,* 90 Pa.Cmwlth. 126, 494 A.2d 56 (1985). The

burden of proof is upon the plaintiff to establish a boundary by the fair preponderance of the evidence. *See* 11 C.J.S. Boundaries § 104.

Although the question of the location of a boundary line is ultimately a question of fact for the factfinder, courts have found the services of land surveyors to be an invaluable aid in making such determinations. *See Com., Pennsylvania Game Com'n v. Keown,* 80 Pa.Cmwlth. 471, 471 A.2d 937 (1984) (testimony of experienced surveyors, especially those familiar with original monuments, is extremely valuable in establishing location of boundary lines); *McGuire v. Leahey,* 16 Cambria 233 (Pa.Ct.Com.Pl.1953) (a surveyor may not testify as to what legal interpretations are to be given a survey; but he may express an opinion as to whether certain marks on trees, piles of stones, or other marks on the ground were intended as monuments of boundaries, such a conclusion being one of fact and not of law).

▮ We found plaintiff's expert witness Richard W. Czop's testimony to be extremely credible and his survey analysis to be exceedingly thorough. Accordingly, we place a great deal of reliance upon the Report compiled by him. Mr. Czop was asked by the government to prepare a report on the existence and location of a tract of land known as "Court House Square," a determination of its ownership in 1864, as well as a determination of the locations of the properties of the signatories of the 1864 Agreement. He testified that he initially plotted the legal descriptions, usually metes and bounds, of the various properties involved in 1864 as well as referenced two ancient maps, the William Allen Map of 1762 and the 1842 Jarrett Map. (N.T. at 13–14). The legal descriptions were obtained from a title company and included primarily deeds and wills.[11] (N.T. at 14). He then conducted an actual field survey of the relevant tracts in accordance with the standards set forth by the American Congress on Surveying and Mapping. Mr. Czop then prepared a Flow Chart of the Chain of

---

10. The parties are in agreement that Pennsylvania property law applies to this action.

11. The legal descriptions were obtained by Stewart of Pennsylvania, Inc. from the office of the Lehigh County Recorder of Deeds. (Government Ex. 1, Preface).

Title of the various parcels and plotted each conveyance made of a particular plat between 1816 and 1927. (N.T. at 15–23).[12]

Since our task is to determine the intentions of the parties at the time of the original subdivision, we turn our attention first to the specific indentures of the relevant properties from the original grantors of Lots 165 and 179 and then move forward chronologically:[13]

*Lot 165*

The deed for the original conveyance of Lot 165 describes the property conveyed as measuring 185 feet in length. (Findings of Fact, hereinafter Findings, ¶ 29). The deeds when Lot 165 was subdivided into thirds, as well as the conveyances immediately subsequent to the division, when they specify length, all describe the property being conveyed as measuring 185 feet in length. (Findings, ¶ 31).

Furthermore, the conveyances to the three signatories of the 1864 Agreement who owned lots derived from Lot 165—Seagreaves (502 Hamilton Street), Unger (504 Hamilton Street), and Saylor (506 Hamilton Street)—all describe the property conveyed as measuring 185 feet in length. (Findings, ¶¶ 35–37). This described length of 185 feet is consistent with the references in all three conveyances to either a "Court House Square" or a "public square" as a northern boundary. (Findings, ¶¶ 59–61).

In 1880, Seagreaves conveyed 502 Hamilton Street to William H. Ainey. The conveyance described the land conveyed as measuring 185 feet in length. (Findings, ¶ 50).

Unger also conveyed his property, 504 Hamilton Street, to William H. Ainey. However, this conveyance refers to Hamilton Street as the northern boundary of the property being conveyed. (Findings, ¶ 51). Although this conveyance did not directly specify a measurement for the property being conveyed, it referred back to a previous agreement between the owners of Lot 165 to size their lots. This agreement indicates that 504 Hamilton Street measured 185 feet in length, directly contradicting the reference to Hamilton Street as the northern boundary. (Findings, ¶ 51).

Turning our attention to 506 Hamilton Street, the Report indicates that it was transferred by will from Saylor to Eliza Woolever and her children and then subdivided amongst the Woolever children. (Findings, ¶ 52). Over the next eight years, as claimant pointed out during Mr. Czop's testimony, the various conveyances amongst the Woolever children convey property that is 230 feet in length. (Findings, ¶ 53). Moreover, these conveyances also make reference to Hamilton Street as the northern boundary of their property. (Findings, ¶ 67). Mr. Czop later noted however, that when the various subdivisions of 506 Hamilton Street were for the first time conveyed outside the Woolever family, all to Robert E. Wright in 1898, these conveyances all included the following reference: "containing in front on the Hamilton Street twenty two and a half feet more or less and a depth of equal width 230 feet if measured from the south side of Hamilton Street or 185 if measured from the front house line on said Court house Square." (Findings, ¶ 68).

*Lot 179*

All the conveyances of the easterly one-half of Lot 179 (508 Hamilton Street) from 1816 to 1927, including the conveyances to and from Henry Longnecker, clearly describe the property being conveyed as measuring 30 feet by 185 feet. (Findings, ¶¶ 33–

---

12. While claimant disagrees with Mr. Czop's ultimate conclusion that the signatories of the 1864 Agreement were not the owners of the condemned property at that time, claimant does not dispute the authenticity of the indentures used by Mr. Czop nor does it dispute the manner in which Mr. Czop plotted the legal descriptions in the indentures he obtained. Furthermore, claimant presented no surveyor of its own to offer a contrary evaluation of the evidence. Accordingly, we have no reason to doubt the veracity of the evidence compiled in the Report by Mr. Czop.

13. It is not necessary for us to engage in a substantive discussion of the conveyances involved in Lot 193, except as they affect the neighboring Lot 179, since the area of the condemned property is directly north of Lots 179 and 165. It is undisputed that Lot 193, which sat to the west of the area the government refers to as "Court House Square," measured 225 feet in length and extended from the southern edge of Hamilton Street to the northern edge of Maple Street.

39, 54–55). Moreover, the conveyance to Longnecker specifically refers to "Court House Square" as the northern boundary of the property conveyed. (Findings, ¶ 62). In 1874, however, the administrator of Longnecker's estate conveyed 508 Hamilton Street to Edmund J. More, Esquire. Like the Unger–Ainey conveyance described above, this conveyance contains inconsistent calls because it both refers to Hamilton Street as the northern boundary of 508 Hamilton Street but also conveys property described as measuring 30 feet by 185 feet. (Findings, ¶¶ 54, 69).

Turning to the westerly one-half of Lot 179, we note that both the original conveyance of the subdivision to Charles L. Hutler in 1816, as well as the subsequent conveyance to Henry Wilson in 1818, describe the property being conveyed as measuring 30 feet by 185 feet. (Findings, ¶¶ 32, 42). Moreover, the conveyance to Wilson describes the property as running "to the South West corner of the Court house Square...." (Findings, ¶ 63).

In 1816, Hutler also received title to the easterly one-half of Lot 193, which directly bordered the westerly one-half of Lot 179. This property, which was later conveyed to Henry Wilson in 1817, was described both in the original conveyance and in the conveyance to Wilson as measuring 30 feet by 225 feet. (Findings, ¶ 43). In 1826, Wilson died and his property (the sum of the easterly one-half of Lot 193 and westerly one-half of Lot 179) passed by will to his widow, Margaret Wilson, and his children. At some point, Margaret Wilson married Joseph K. Saeger and became Margaret Saeger. Through a Deed in Trust dated and recorded in 1839, her interest in the property inherited from Henry Wilson was conveyed to John Groft as trustee.[14] This deed inexplicably described the sum of the property being conveyed as measuring 60 feet by 230 feet. (Findings, ¶¶ 46–47).

The indenture evidence presented by the government in support of its position that in 1864 the now condemned property was public land known as "Court House Square," by and large is consistent and compelling: All of the deeds recording conveyances to the signatories of the Agreement either make reference to a "Court House Square" or to a "public square" as a boundary. Moreover, all the conveyances from the original grantors of Lots 165 and 179 forward to and including the conveyances of the subdivisions of these lots to the signatories of the 1864 Agreement convey property which is described as 185 feet in length.[15]

The several inconsistencies that exist with regard to these indentures all appear in conveyances from the signatories of the Agreement, and we have noted above all those that were brought to our attention. First, both the conveyances from Unger to Ainey of 504 Hamilton Street and the administrator of Longnecker's estate to More of 508 Hamilton Street reference Hamilton Street as a northern boundary for their respective properties but also describe the property being conveyed as measuring 185 feet in length, plainly inconsistent statements.

■ When the calls of an indenture are found to be inconsistent, Pennsylvania courts have followed certain general principles of preference:

> [o]ther things being equal, resort is to be had first to natural objects or landmarks, next to artificial monuments, then to adjacent boundaries (which are considered a sort of monument), and thereafter to courses and distances.

*Baker v. Roslyn Swim Club*, 206 Pa.Super. 192, 213 A.2d 145, 148 (1965) (citing 12 Am. Jur.2d, Boundaries, § 65 at 603 (1964)). The rationale behind this rule of construction is the belief that erroneous descriptions are more likely to be found in calls for measurements and distances than in calls for fixed

---

14. This action was most likely taken to circumvent the state laws in effect at that time which prevented a married woman from owning, leasing, selling, entering into a contract regarding or otherwise disposing of her real estate without the joinder of her husband. *See* Ladner on Conveyancing In Pennsylvania, § 4:08 (1961 ed.).

15. This, of course, is with the exception of the easterly one-half of Lot 193, which is not at issue here, conveyed to Henry Wilson in 1817, and described as measuring 30 feet by 225 feet.

landmarks, either natural or artificial. *Doman v. Brogan,* 405 Pa.Super. 254, 592 A.2d 104, 110 (1991). If we apply these rules of preference to the situation at bar, the calls to Hamilton Street, because they are monumentation, should take priority over the reference to 185 feet, a distance. However, the rationale for this preference of monuments over courses and distances in this case is not as compelling as it otherwise might be since the dispute does not center over a few feet of land, but rather whether any of the parties ever had possession of an extra 40 feet of land.

For this type of reason, the Pennsylvania courts have held that this rule of construction is not one to always be strictly construed but is merely an aid in determining intention. Consequently, "it is not followed where strict adherence to the call for a monument would lead to a construction plainly inconsistent with such intention." *Pencil,* 551 A.2d at 306 (citing 11 C.J.S. Boundaries § 51). "[I]n the end, the true construction is ascertainable by the totality of the combined effect [of the terms of description] and not wholly or exclusively by any one term when it is irreconcilable with the other terms of description." *Appeals of Borough of Dallas,* 169 Pa.Super. 129, 82 A.2d 676 (1951); *see also Pencil,* 551 A.2d at 306; *Doman,* 592 A.2d at 110 (preference of monuments is not imperative nor mutually exclusive in sense that to rely on monument prevents any reference to other measurements, distances, etc., that are proximate and thus supportive, but not coexistent with monuments). A "totality of the combined effect" approach is especially desirable here where there is not one indenture, but many that all ultimately reflect upon the same conclusion.

Evaluating these two discrepancies under a "totality" approach, it appears that the references to Hamilton Street as the northern boundary in these indentures are more than likely the result of error, with the references to 185 feet serving as the more accurate call. It is undisputed that both Unger and Longnecker were conveyed property described as measuring 185 feet in length, and both these conveyances made reference to a "Court House Square." (Findings, ¶¶ 34, 60, 62). Moreover, there is no record of a transfer to either party of any additional land north of their respective properties. With regard to the Unger–Ainey conveyance of 504 Hamilton Street, which is the middle one-third of Lot 165, it would be peculiar for that subdivision to extend the entire 225 feet to Hamilton Street while the two surrounding subdivisions only extended 185 feet. With regard to 508 Hamilton Street, we note as important the fact that in the several conveyances following that to More, the land conveyed is described as measuring 185 feet in length, and does not appear to make reference to a northern boundary. We find it more than likely, then, especially since the area referred to as "Court House Square" was a vacant lot, that these two conveyances were simply in error when they referred to the northern boundary as being Hamilton Street.

With regard to the internal Woolever conveyances of 506 Hamilton Street, we note first that they are internally consistent since they all refer to Hamilton Street as a northern boundary and describe the property being conveyed as measuring 230 feet in length.[16] (Findings, ¶¶ 53, 67). Nevertheless, under a "totality" approach these conveyances are irreconcilable with the greater weight of the evidence described above. All the conveyances leading up to and including the conveyance to Saylor, an 1864 signatory, describe the property being conveyed as measuring 185 feet in length, and there is no evidence that any additional property was transferred to Saylor. (Findings, ¶¶ 30, 31, 36). Moreover, it appears that the Woolevers were aware that the length of the property they were conveying may have been in error since the conveyances to Wright in 1898 of all of the subdivisions of 506 Hamilton Street include both 230 feet and 185 feet as measurements of the property depending upon whether, they state, the property was measured from the edge of Hamilton Street or the edge of "Court House Square." (Findings, ¶ 68).

---

**16.** The conveyances are somewhat misleading, however, since the measured distance from the southern edge of Hamilton Street to the northern edge of Maple Street is 225 feet, not 230 feet.

Finally, the Deed in Trust from Margaret Wilson Saeger to John Groft conveys property described as 230 feet in length. (Findings, ¶ 47). While defendant opines that this conveyance serves as proof of Margaret Wilson Saeger's ownership of a portion of the area the government refers to as "Court House Square," under a "totality" approach we are hesitant to draw that conclusion since there is no dispute that the conveyance of the westerly one-half of Lot 179 to Henry Wilson described the property as measuring 185 feet in length as well as referenced "Court House Square" as a northern boundary. (Findings, ¶¶ 42, 63). Moreover, there is no recorded transfer that either party has brought to our attention which indicates that an additional 30 feet by 40 feet parcel directly north of the westerly one-half of Lot 179 was conveyed to either Henry or Margaret Wilson Saeger at any point before 1864. More likely than not, the length described in the Deed in Trust was the result of a mistaken belief that the westerly one-half of Lot 179 was the same length as the easterly one-half of Lot 193. Moreover, although the conveyance from the administrator of Margaret Saeger's estate to F.A.R. Baldwin in 1888 also conveys land described as 60 feet by 230 feet and refers to Hamilton Street as the northern boundary of the property, this conveyance also states that the intent is only to convey what Henry Wilson had. (Findings, ¶¶ 56–57). Consequently, we cannot find that any of these inconsistencies are sufficient to support defendant's position that the now condemned

property was owned by the signatories of the Agreement in 1864.[17]

The conclusion reached by Mr. Czop, that none of the signatories of the 1864 Agreement had an ownership interest in the condemned property, was arrived at independently by the government's second expert witness, Thomas M. Croke, Esquire, a real estate title expert. Mr. Croke commissioned a chain of title search of the land south of the condemned property. Based upon his review of this search, as well as many other relevant documents, he testified that it was his belief that in 1864 the condemned property was owned by the public, not the signatories of the Agreement. (Findings, ¶ 83).[18]

Claimant Commonwealth Realty does not dispute any of the evidence presented by the government with regard to the chain of title of the various signatories, and aside from the discrepancies noted above, presented no similar evidence to support its position that the condemned property was owned by the 1864 signatories. Instead, it relies primarily on the 1864 Agreement itself. Claimant contends that because the signatories declared themselves to be the owners of the vacant lot ("We the undersigned owners of the vacant ground . . ."), they must in fact have been. Otherwise their actions would have been in the "theatre of the absurd" since all the signatories were legally knowledgeable and well known in the community, making near impossible a "naked land grab."[19] Claimant

17. Moreover, even if the several inconsistencies in these indentures clearly supported defendant's position, on balance, under a "totality of the combined effect" approach, the indenture evidence as a whole would still weigh in favor of the government's position.

18. Plaintiff United States also argues in its trial and post-trial memoranda that since Margaret Wilson Saeger, Commonwealth Realty's predecessor in interest, conveyed her interest in the property inherited from Henry Wilson by a Deed in Trust to John Groft in 1839, and there is no record of it being conveyed back to her, she was not the record title holder of that property when she signed the 1864 Agreement. (Findings, ¶ 48). Consequently, they maintain, there was no privity of estate between Mrs. Saeger and the other signatories of the 1864 Agreement. Commonwealth Realty disputes this point and maintains that Joseph K. Saeger was dead by 1864 and hence title had reverted back to Mrs. Saeger

by operation of law. Mr. Czop and Mr. Croke both testified, however, that it is their belief that the Trust was not self executing by its terms. As far as we can determine, a copy of the Deed in Trust was not introduced into evidence at trial. Since we have not analyzed the Deed, we cannot determine what effect the Deed in Trust had on Margaret Wilson Saeger's ability to competently enter into the 1864 Agreement.

19. Claimant argues that the citizens of Allentown would have arisen in outrage if the five signatories had attempted to appropriate public land for their own use and offers a present day analogy:

What do you suppose would occur if when Chief Judge Edward N. Cahn left his present chambers in the old Court House and upon walking outside saw a sign which instead of the announcement of the new Federal Court House, a sign proclaimed 'New office building

also maintains, based upon a search of histories and anthologies at the Allentown Public Library and the Lehigh County Historical Society, that "[i]n the histories of Lehigh County, there is *no mention* of the existence of a Court House Square up to and including 1864, the date of the agreement." Finally, at the hearing claimant offered postcards and pictures which depict the condemned property as being fenced in at various times after 1864, in support of its position that the condemned property was privately owned by the signatories of the Agreement.

We find claimant's first argument, that because the signatories declared that they were the owners it must indeed be so, to be circular and wholly unpersuasive. Moreover, although claimant offers the conclusion that none of the histories of Allentown make mention of a "Court House Square" no documentation or evidence was presented at the hearing to indicate how broad the search was, which particular anthologies were consulted, nor whether any evidence from anthologies was found that proved in the affirmative, rather than the negative, that "Court House Square" did not exist. And while the postcards and pictures serve as a fascinating foray into Allentown's days of yore, at most they indicate to us that the condemned property was indeed fenced in at various times after 1864. We refuse to follow claimant's leap from this point to the distant conclusion that these postcards evidence ownership of the condemned property by the signatories of the 1864 Agreement, especially in light of the significant recorded documentary evidence to the contrary.

Finally, the evidence regarding chain of title is supported by the two ancient maps presented by the government at the hearing. The first, the William Allen Map of 1762, appears to divide the area the government refers to as "Court House Square" from Lots 165 and 179. (Findings, ¶ 71). Mr. Czop testified that in his opinion this division signifies the creation of "Court House Square." He also testified that the second map, the

1842 Jarrett Map, depicts an offset at the southwest corner of Hamilton and Margaret Streets and thus corresponds to the division on the William Allen Map of 1762. (Findings, ¶¶ 74–75). Claimant disputes this conclusion and argues that "the William Allen Map does *NOT* refer, at all, to any Court House Square," and maintains that in 1762 there would have been no need for a Court House Square since Northamptontowne was a part of Northampton County and not the county seat.

We find claimant's arguments in this regard to also be without merit. While it is true that the William Allen Map does not explicitly refer to the divided area as "Court House Square," Mr. Czop testified, and claimant admits in its trial memorandum, that dedications of public lands are often made by marks on plats or drafts. *See Hoffman v. City of Pittsburgh,* 365 Pa. 386, 75 A.2d 649 (1950) ("The usual mode of designating streets, squares, etc., to the public in this State is simply to designate them on the plat or draft of the town as such . . .") (quoting *Commonwealth v. Rush,* 14 Pa. 186); *see also Millcreek Tp. v. A Piece of Land,* 181 Pa.Super. 214, 124 A.2d 448 (1956) (offer of dedication may be made by express declaration or by acts, deed or plat). With regard to claimant's second argument, we note only that Mr. Czop testified that it was his opinion that the designation of "Court House Square" occurred sometime between 1762 and 1842. Since Lehigh County was formed in 1812, and the Borough of Northampton became its county seat that same year, it is possible that a "Court House Square" was designated in that time period. In any event, the 1842 Jarrett map confirms that by 1842 the area referred to as "Court House Square" appears to have been separated from Lots 165 and 179, certainly well before the signing of the 1864 Agreement.

Consequently, on balance, after careful consideration of the detailed exhibits submitted by the parties, the testimony presented

---

for Saddam Hussein' and a force of Iraqi soldiers marching up and down. Once could expect there would be a reaction.
Claimant's Trial Memorandum at 18. While we have no doubt that our esteemed and normally

unflappable Chief Judge would react to such a situation, his reaction, however appropriate, is not germane to our decision.

at the hearing, and the parties' trial and post-trial memoranda, we find that plaintiff has overwhelmingly met its burden of proof and hold that Court House Square did indeed exist in 1864 at the southwest corner of Hamilton and Margaret Streets; that ownership of the Square was in the public at that time; and the signatories of the 1864 Agreement at no time possessed any ownership rights in the Square, a part of which is now the condemned property and the subject of this action.[20]

The conclusion we reach here today, that ownership of Court House Square laid in the public, is the same as that reached by the honorable Judge Davison of the Lehigh County Court of Common Pleas in *County of Lehigh v. Yundt, et al., supra,* more than twenty years ago. Although it would have been our preference to have simply based our finding upon Judge Davison's complete and scholarly discussion of the same issue in *Yundt,* we were unable to do so because, as we discussed earlier, that opinion had no res judicata or collateral estoppel effect on the parties to this action. While we cannot rely on the *Yundt* opinion we may certainly take notice of it since a court may examine proceedings in other courts if those proceedings are directly related to the matters presently at issue. *See United States ex rel. Geisler v. Walters,* 510 F.2d 887, 890, n. 4 (3d Cir.1975); *see also St. Louis Baptist Temple, Inc. v. FDIC,* 605 F.2d 1169, 1172 (10th Cir.1979) (a court may look at related proceedings in other courts, if those proceedings have a direct bearing on the matters at issue).

Turning briefly to *Yundt,* we note that the specific question before Judge Davison was "whether any public rights exist in ... [the] subject tract ... located at the southwest corner of Fifth and Hamilton Street." 35 Lehigh Law Journal at 437. It was the position of defendant Yundt, the owner of the parcel of land to the immediate south of the

subject tract, that he in fact was the owner of the subject tract. Judge Davison, after a review of evidence of ancient maps and indentures presented by the County of Lehigh which was the same or similar to the evidence presented to this court, concluded that title to the subject tract is in the public:

> Addressing ourselves to the substance of what has been presented, we conclude that plaintiff has shown the existence of public rights in and to the subject tract by virtue of the conveyances, maps and other documents, and for the other reasons set forth herein. The 1762 William Allen Map, the 1842 Jarrett Map and the Ashbaugh Map, all evidence an intention to designate or set aside a special area at the southwest corner of Fifth and Hamilton Streets, albeit no direct reference was made therein by name to a Court House Square as such. The Proprietors–Hutler deed for the eastern one-half of Lot 193 specifically refers to the Court House Square as the eastern boundary of that conveyance. The deeds for the eastern and western halves of Lot 179 not only designated the Court House Square as their northern boundaries but also conveyed a depth of one hundred eighty-five feet as distinct from the two hundred twenty-five feet area then in existence along Fifth Street. The other lots in the block appear to extend a full two hundred twenty-five feet. The 1864 Agreement reveals the intention of the adjacent lot owners at the time to forever bar from the subject tract "... buildings or other structures calculated to impair ... [the] beauty or ancient view from the buildings on said lots." **We hold that public rights, preeminent to all private ownership, exist in the subject tract.**

*Id.* at 444 (emphasis in original).[21]

■■■ Having found that the now condemned property in 1864 was a part of public land known as Court House Square, and by extension that the signatories of the 1864

---

**20.** We need not discuss the issue of adverse possession since claimant admits that the law is, and was in 1864, that adverse possession cannot be had against public lands. *See* Claimant's Trial Memorandum at 19; *U.S. v. Vasarajs,* 908 F.2d 443 (9th Cir.1990).

**21.** Interestingly enough, Judge Davison cites the 1864 Agreement as **support** for his finding that

title to the subject tract is in the public. While claimant opines that this statement indicates that Judge Davison found that no buildings could be erected on the subject tract, we do not agree with this interpretation and note that in fact Judge Davison explicitly disavowed any such holding: "... we specifically withhold any ruling as to what, if anything, may be erected or established on the Court House Square parcel." *Id.* at 447.

Agreement had no ownership rights in it, the issue of whether the 1864 Agreement created any reciprocal easements appurtenant is moot. The owner of the land, the public, was not a party to the 1864 Agreement and, consequently, the federal government, as a successor in interest, is not bound by the Agreement. *See Baptist Church,* 406 Pa. at 625, 178 A.2d 583 (defendants could not "reserve" easement across lands they did not own).[22]

## III. CONCLUSION

For the reasons discussed in the foregoing opinion, we dismiss claimant Commonwealth Realty from this action with prejudice.

---

Moreover, Judge Davison took note of certain language from other cases regarding this proposition:

> We must conclude, therefore, that while undoubtedly this Center Square cannot be used for other than public purposes, any particular uses within that limitation were neither commanded nor restricted.... Whenever property is dedicated in merely general terms to public use such use necessarily varies with the changing circumstances, customs and requirements of city life....

*Id.* at 448 (internal citations omitted).

22. Even if we had found that ownership of the now condemned property had been in the signatories of the 1864 Agreement at that time, it would not necessarily follow that we would find that reciprocal easements appurtenant for light, air and ancient view were created by the Agreement. We note first that under Pennsylvania law, easements for light and air can only be acquired through an express grant and not through prescription. *See RKO–Stanley Warner Theatres, Inc. v. Mellon Nat. B. & T. Co.,* 436 F.2d 1297 (3d Cir.1970) (citing *Maioriello v. Arlotta,* 364 Pa. 557, 73 A.2d 374 (1950); Ladner on Conveyancing in Pennsylvania § 6:13 (1961 ed.). The government advances the argument, supported by case law, that such an express grant can only be made by use of the words "light and air" in the conveyance. Government's Trial Memorandum at 16, citing *Henry v. Eves et al.,* 306 Pa. 250, 256, 159 A. 857, 858 (1932) (finding that no easement for light and air existed since wording of Agreement did not explicitly so state and because parties could easily have provided for such language). The 1864 Agreement makes no express mention of the words "light and air" and claimant has offered no case law to contradict the government's position. Accordingly, it is doubtful that we would find that such an easement was formed in 1864.

Even though we have discovered no cases in Pennsylvania law that explicitly discuss an easement for view, and the parties have failed to provide any, we are confident that the Pennsylvania courts would treat such an easement in the same manner as they do easements for light and air, as is the case in other jurisdictions. *See generally* 1 Am.Jur.2d Adjoining Landowners §§ 90–105 (Light, Air, and View). Although the 1864 Agreement explicitly mentions "ancient view," this in and of itself is not enough to create an express easement for view. An express easement is in substance a covenant running with the land, and we find persuasive the case law cited by the government which holds that a covenant running with the land must be accompanied by a transfer of an interest. *See Penn–O–Tex–Oil & Leasehold v. Big Four Oil & Gas Co.,* 298 Pa. 215, 148 A. 92 (1929) (since no evidence of requisite assignment or transfer found, covenant could not run with the land). As far as the evidence has shown in this case, there was no such transfer of interest accompanying the 1864 Agreement.

Moreover, there is also support in Pennsylvania case law for the proposition that easements for light, air and view may be destroyed if the character of the neighborhood in which they were first formed changes. *See Snyder v. Plankenhorn,* 398 Pa. 540, 159 A.2d 209 (1960); *LaRue v. Weiser,* 378 Pa. 438, 106 A.2d 447 (1954). The area surrounding the condemned property, residential in 1864, is now undisputably commercial. Consequently, even if we were to find that any easement appurtenant was created by the 1864 Agreement, we would be hard pressed to find that such an easement was still in effect in 1994.