**Walter MILLIGAN, et al.,**

v.

**James MILLIGAN and Agnes Milligan.**

Supreme Judicial Court of Maine.

Argued March 2, 1993.

Decided May 5, 1993.

Douglas F. Jennings (orally), Doyle & Nelson, Augusta, for plaintiffs.

Clifford H. Goodall (orally), Dyer, Goodall & Larouche, Augusta, for defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS, and RUDMAN, JJ.

COLLINS, Justice.

Walter Milligan, Stella Milligan, Pamela Pelletier, and Elmer Pelletier (the plaintiffs) appeal from a judgment, entered in the Superior Court (Kennebec County, *Fritzsche, J.*) after a jury-waived trial, in favor of James and Agnes Milligan (the defendants) in a boundary dispute between the parties. This boundary dispute involves an area known as Bangs Beach on the shore of Lake Messalonskee in Sidney. The trial court adopted the defendants' construction of the deed that places a substantial portion of the beach and all of the beach-related buildings within their property. Because the evidence in the record, when viewed in its entirety, supports the trial court's decision, we affirm the judgment.

In 1946, Stella Bangs and her sister, Doris Drake, deeded a large tract of property on Lake Messalonskee to Stella's daughter Annette McCormack and her husband, Robert McCormack. This tract included an area known as Bangs Beach that the McCormacks then opened to the public. They charged an admission fee and ran a concession stand, a dance hall, and provided changing rooms.

In a deed dated September 8, 1969, the McCormacks conveyed a portion of their land to their grandson, Robert Milligan, and his wife, Jean Milligan. Robert Milligan recorded this deed on September 11, 1969. In another deed of the same date, the McCormacks conveyed another portion of their property to their grandson, James Milligan, and his wife, Agnes Milligan. The deed to James and Agnes contained a call describing 450 feet of shore frontage. James testified that he hesitated to record his deed until he had confirmed this shoreline call with his grandfather. When

James asked his grandfather about this call, McCormack replied, "That's the way the deed is supposed to be written." James recorded the deed on October 1, 1969.

About a year later, the McCormacks conveyed the remainder of their Lake Messalonskee property, including the homestead, to their only daughter, Stella Milligan; Stella's husband, Walter Milligan; and the McCormacks' granddaughter, Pamela (Milligan) Pelletier. The McCormacks reserved a life estate in the property. There was testimony that, at about the time of this conveyance, Mr. McCormack told a neighbor that he intended to transfer the entire beach area to Stella, Walter, and Pamela. Mr. McCormack made similar comments to Stella, Walter, and Pamela. In a deed dated October 6, 1989, (after both Annette and Robert McCormack had died) Stella, Walter, and Pamela conveyed this property to Pamela and her husband, Elmer Pelletier. Stella and Walter retained a life interest in the property.

After the 1969 and 1970 conveyances, the family, including James and Agnes, continued to run the beach operation together. The beach operation continued until shortly after Robert McCormack's death, in 1988. Not long after Mr. McCormack's death, however, the parties began to dispute the boundary between their lots. James and Agnes asserted that, according to their deed, they owned a substantial part of the beach as well as the property on which all the beach-related buildings were located. Stella, Walter, Pamela, and Elmer (the plaintiffs) filed a complaint to quiet title and for a preliminary injunction against James and Agnes (the defendants). James and Agnes filed a counterclaim.

The controversy in this case surrounds the deed to James and Agnes that describes the land conveyed as follows:

> Beginning at a point on the west line of the Pond Road, so called, at the northeasterly corner of Waldo Drake; thence running northerly along the west line of said Pond Road a distance of five hundred forty-four (544) feet, more or less, to a point in the southerly line of a right

of way; thence westerly along the south line of said right of way to the northeasterly corner of land deeded this date to Robert Milligan and Jean Milligan; thence southerly along the east line of land of the said Robert Milligan et al, to said Robert Milligans' southeasterly corner; thence westerly along said Robert Milligans' southerly line to the easterly shore of Lake Messalonskee, also known as Snow Pond; thence southerly along the easterly shore of said Lake four hundred fifty (450) feet, more or less, to an iron pin; thence in an easterly direction two hundred sixty (260) feet, more or less, to the point of beginning.

This deed, unlike the later 1970 deed to Stella, Walter, and Pamela, makes no mention of any buildings or any right of way to reach the beach-related buildings. The parties agree on the beginning point as well as the calls establishing the boundaries along the road and Robert and Jean Milligan's property. The parties disagree, however, on how to construe the final calls of the deed which read:

> thence southerly along the easterly shore of said Lake four hundred fifty (450) feet, more or less, to an iron pin; thence in an easterly direction two hundred sixty (260) feet, more or less, to the point of beginning.

Neither the plaintiffs' nor the defendants' surveyor found any iron pin at 450 feet along the shoreline. Walter and Stella testified at the trial that there had never been a pin in this location on the shoreline; this testimony was unrebutted. The surveyors also agreed that the final call, "two hundred and sixty (260) feet, more or less, to the point of beginning," is inadequate to close the property because the distance from 450 feet along the shoreline to the point of the beginning is actually well over 700 feet.

The defendants' surveyor simply replaced the "missing" pin at 450 feet along the shoreline and drew a straight line between this point and the beginning point. This deed construction places a substantial portion of the beach and all of the beach-related buildings within the defendants'

property. This interpretation of the property line also results in a gore not conveyed by the McCormacks during their lifetimes.

The plaintiffs' surveyor testified that, because the calls did not close the property and because he found no original pin at the point 450 feet along the shore, he "worked backwards" from the terminal monument of the final call, i.e., the beginning point. Using this technique, he followed an adjoining property for about 275 feet from the beginning point and found an iron pin.[1] He then followed a stone wall to the shore, a distance of approximately 465 feet from the pin. The plaintiffs' surveyor suggested that there was an entire call missing from the deed; his interpretation would basically rewrite the deed to read:

> ... thence south*west*erly along the easterly shore of said Lake *one hundred and sixty (160) feet, more or less; thence southerly along the stone wall* four hundred and fifty (450) feet, more or less, to an iron pin; thence in an easterly direction two hundred and sixty (260) feet, more or less, to the point of beginning.

(Emphasis on new material). This construction puts the entire beach, as well as all of the beach-related buildings, on the plaintiffs' side of the boundary.

The trial court rejected the plaintiffs' approach and instead adopted the straight-line approach taken by the defendants' surveyor. The trial court further enjoined the plaintiffs from entering this property except to remove their personal property.

■ What boundaries a deed refers to is a question of law but where those boundaries exist on the face of the earth is a question of fact. *Theriault v. Murray*, 588 A.2d 720, 721 (Me.1991). When interpreting a deed, a court should first look for the controlling intent of the parties on the face of the deed. *Taylor v. Hanson*, 541 A.2d 155, 157 (Me.1988). The intent of the parties may not be clear from the face of

the deed, however, if that deed contains a latent ambiguity. *Id.* A latent ambiguity in a deed is "created when, in applying the description to the ground, facts extrinsic to the document controvert or in some way render unclear the deed's apparently unambiguous terms." *Id.* Because the calls in the defendants' deed fail to close the property, a latent ambiguity exists. *Id.* (citing *Greely v. Weaver*, 13 A. 575, 575–76 (Me. 1888)). When the language of a deed is susceptible of more than one meaning, the trial court must determine the grantors' intent from contemporaneous circumstances and from standard rules of construction. *Theriault*, 588 A.2d at 722.

■ There was competent evidence supporting the trial court's decision to adopt the defendants' construction. For example, shortly after the conveyance, James expressly asked his grandfather about the 450 feet of shoreline described in the deed and was told "[t]hat's the way the deed is supposed to be written." This is extremely strong evidence that at least one of the grantors specifically intended the deed to convey 450 feet of shore frontage to James and Agnes. The trial court also noted that "[i]t is logical to assume that as [the shoreline call] is the most important call[,] the lawyer who drafted the deed and the grantors would have carefully examined this key provision." The trial court's assumption that Robert McCormack would have carefully considered this call especially when it was brought to his attention by James was not error. *See Bradford v. Cressey*, 45 Me. 9, 14 (1858) (fact that property line would run through the dam "so important [it] could hardly have been overlooked by the parties to that deed."); *see also First Hartford Corp. v. Kennebec Water Dist.*, 490 A.2d 1209, 1211 (Me.1985) (dam interest, if meant to be conveyed, would not have been overlooked by the parties). *But cf. Taylor v. Hanson*, 541 A.2d at 157–58 n. 6, 158 (court should "give equal weight to and [harmonize] all the calls in the deed").

---

**1.** The reliability of this iron pin was contested. Walter testified that he had painted the pin white and cleared around it so that the surveyors would be sure to see it but did not disturb the pin's original location. The defendants' surveyor, however, testified that his crew thought the white pin had been recently set because of the fresh paint and the fact that it was not driven very far into the ground.

The trial court should also look to the standard rules of construction to determine the grantors' intent when the deed contains a latent ambiguity. *Theriault,* 588 A.2d at 722. According to these rules, boundaries are controlled by, in descending priority, monuments, courses, distances, and quantity unless this produces a result that is absurd or manifestly inconsistent with the parties' intentions. *Taylor,* 541 A.2d at 158. A physical object is not a monument unless the deed's description makes a reference to it for that purpose. *Proctor v. Hinkley,* 462 A.2d 465, 469 (Me. 1983). The controversial language in the defendants' deed reads:

> thence southerly along the easterly shore of said Lake four hundred fifty (450) feet, more or less, *to an iron pin;* thence in an easterly direction two hundred sixty (260) feet, more or less, *to the point of beginning.*

(Emphasis added). The parties agree that the point of beginning is also the terminal monument of the deed. They disagree, however, about the role of the iron pin. The trial court held that "[t]he absence of a pin at 450 feet along the lake does [not] end its use in defining the boundary." The physical disappearance of a monument terminates its status as a boundary marker unless its former location can be ascertained through extrinsic evidence. *Ricci v. Godin,* 523 A.2d 589, 592 (Me.1987) (citing *Bailey v. Look,* 432 A.2d 1271, 1274 (Me. 1981)). Because the unrebutted testimony in this case was that no pin (other than that placed by the defendants' surveyor) was ever located at 450 feet along the shore, the pin could no longer be considered a monument. The trial court concluded, however, based on the extrinsic evidence of the grantors' intent, that the shoreline call terminated 450 feet along the shoreline. The only remaining monument in the deed is the beginning point. The defendants' construction is consistent with that terminal monument.

Although the evidence in this case would support a contrary conclusion, we find sufficient evidence in the record before us to support the trial court's decision to adopt the defendants' proposed construction of the deed. James and Agnes both testified that Robert McCormack told them that he intended the deed to read as it did. Furthermore, the Defendants' construction of the deed requires less deviation from the actual language in the deed than does the plaintiffs' construction.

The entry is:

Judgment affirmed.

RUDMAN, Justice, with whom ROBERTS, Justice, joins, dissenting.

I respectfully dissent.

There is no question that the deed from Annette and Robert McCormack to James and Agnes Milligan is ambiguous. In such instances, the trial court must look to the standard rules of construction to determine the grantor's intent. *Theriault v. Murray,* 588 A.2d 720, 721–22 (Me.1991). According to these rules, boundaries are controlled by, in descending priority, monuments, course, distances, and quantity *unless this produces a result that is absurd or manifestly inconsistent with the parties' intentions. Taylor v. Hanson,* 541 A.2d 155, 158 (Me.1988). The result achieved by the trial court and affirmed by the court is, in my mind, absurd and results from a mechanistic application of the rule.

In 1969, Robert and Annette McCormack conveyed portions of their Lake Messalonskee property to their grandsons and their grandsons' spouses. A year later, the McCormacks conveyed the remainder of their property which included their homestead to their daughter, son-in-law, and granddaughter reserving to themselves a life estate in the property. Subsequent to the conveyances, the family, including the McCormacks, continued to operate their beachfront recreational facility as they had in the past. It seems logical to me that had the McCormacks intended that the beachfront recreational facility and the property upon which it is situate be conveyed to their nineteen-year-old grandson, James, and his wife, Agnes, that they would have reserved a life estate in that property. The result arrived at by the Superior Court transfers the shore front-

age, together with the concession building and changing rooms, to James and Agnes without title to or an easement to use the road leading from the Pond Road to the beach and creates a gore between James' property and the property conveyed to James' parents and his sister. The trial court based its decision on the assumption that the McCormacks desired to treat their grandchildren equally, and that the McCormacks, in 1969, placed a higher value on shore frontage as opposed to road frontage. Neither assumption is necessarily correct. As the court states, the plaintiffs' surveyor suggested a result which makes sense, and although there was evidence supporting the trial court's decision to adopt the construction suggested by James and Agnes Milligan, such a construction overlooks the limiting clause contained within the rules of construction.