**PEMERIKA L. TAUILIILI, Plaintiff,**

**v.**

**PAU FALEATUA, MUA FALEATUA, PATRICIA FALEATUA
aka PATRICIA SALAS, and DOES 1-20, Defendants.**

High Court of American Samoa
Land and Titles Division

LT No. 02-99

September 12, 2000

Before RICHMOND, Associate Justice, and ATIULAGI, Associate Judge.

Counsel: For Plaintiff, Gwen F. Tauiliili-Langkilde
For Defendants, Asaua Fuimaono

## Opinion and Order

This action arises out of a boundary dispute between plaintiff Pemerika L. Tauiliili ("Tauiliili") and defendants Pau Faleatua ("Pau"), Mua Faleatua ("Mua"), and Patricia Faleatua ("Patricia") (together "the Faleatuas"). The parties share a common boundary between their lands, but they vehemently disagree on the location of that boundary by a few feet.

Tauiliili seeks injunctive relief requiring the Faleatuas to remove their fence and other property and preventing their further trespass on his land, and payment of compensatory and punitive damages. The Faleatuas counterclaim for injunctive relief preventing Tauiliili from further trespass on their land, for payment of compensatory and punitive damages, and to hold Tauiliili in contempt for violating this Court's order in *Faleatua v. Tauiliili*, 19 A.S.R.2d 122 (Land & Titles Div. 1991).

On March 4, 1999, upon the parties' stipulation, the Court issued a preliminary injunction that essentially maintained the status quo pending final judicial disposition. Trial was held on September 13, 16, and 17, and October 14, 15, and 19, 1999. Final written arguments were scheduled. Tauiliili's argument was submitted on November 30, 1999, and the Faleatuas' argument was submitted on December 28, 1999.

## Discussion

A. Lands Involved

The lands at issue are subdivided portions of a larger land area,

approximately 11.789 acres, known as "Leavapui Lua" in the Village of Tafuna, American Samoa. The larger land area is situated immediately outside of the northwest area of the American Samoa Government's Pago Pago International Airport ("the airport") on the sea side of, and adjacent to, the public road from the airport to the Village of Ili`ili. On August 17, 1971, the Territorial Registrar of the American Samoa Government registered the larger land area to A.P. Lutali ("Lutali") as his individually owned land.

To facilitate the discussion, Appendix A has been prepared as a not-to-scale diagram of the lands at issue and other relevant subdivided portions. We will identify the subdivided portions by the lot letters assigned in the surveys in evidence. In the order they were chronologically created, the subdivided portions are as follows:

1. In November 1972, Lutali conveyed 0.5 acre, Lot E, to Pastor Suaesi Tagaloa. The warranty deed was recorded with the Territorial Registrar on December 20, 1972.

2. On May 15, 1973, Lutali conveyed 0.5 acre, Lot J, to Patricia. The warranty deed was recorded with the Territorial Registrar on or shortly after May 15, 1973.

3. Also on May 15, 1973, Lutali conveyed 1.0 acre, Lot A, to Tauiliili. The warranty deed was recorded with the Territorial Registrar on April 11, 1974.

4. Again on May 15, 1973, Lutali conveyed 0.5 acre, Lot V, to Sydney and Anne Glenister (together "the Glenisters"). The warranty deed was recorded with the Territorial Registrar on July 17, 1979.

5. On October 30, 1973, Lutali conveyed 0.5 acre, Lot S, to Saunoa Pene Choi and her two children. The warranty deed was recorded with the Territorial Registrar on or about April 14, 1974.

6. On June 22, 1987, Lutali conveyed 0.649 acre ("Lot B") to Pau and Mua. The warranty deed was recorded with the Territorial Registrar on June 23, 1987.

7. On May 29, 1998, Susana L. Lutali, Lutali's wife, leased 0.312 acre ("Lot X") to John E. Suisala and Josie G. Lutali. The lease was recorded with the Territorial Registrar on June 3, 1998.

The physical locations of the subdivided portions relative to each other are as follows:

1. Lot X, Lot S, Lot V, Lot A, and Lot B are located in a row from Lot

X at north end to Lot B at the south end. The boundaries on the eastern side of each of these lots run along a straight line from the main road on the north side of Lot X to the boundary of the airport along the southern side of Lot B. The western boundary of the airport in this area, from north to south, is common with the eastern boundaries of approximately one-half of Lot 5, Lot V, Lot A, and Lot B. The airport boundary then turns at a right angle and heads eastward. The airport boundary is fenced. A rock wall extends from the main road near but outside the east side of Lot X to the approximate midpoint of the east side of Lot S where the airport boundary turns eastward.

2. Lot J is bounded by Lot A on the north side and by Lot B on the east and south sides.

3. Lot E lies on the other side of an access road directly westward of Lot A.

4. The boundaries on the northern side of Faleatuas' Lot B and Lot J also run along a straight line from the eastern side of Lot B to the western side of Lot J and coincide with the boundary on the southern side of Tauiliili's Lot A ("the common boundary").

The correct location of the common boundary is the parties' essential dispute.

B. Early Corrective Action

After Tauiliili acquired Lot A and before the Glenisters acquired Lot V, Tauiliili learned that the boundary on the eastern side of Lot A, as described in his deed, encroached onto the airport. The area north of Lot A was then still vacant, and Lutali agreed to move the boundary on the northern side of Lot A seven feet northwards to compensate for the area lost by the surveying error. The modification did not affect the common boundary, except to shorten it at the east end. Although promised, a revised deed was never prepared and recorded. However, to reflect this change, a surveyor relocated monuments on the land at the northwest, northeast, and southeast corners of Lot A in Tauiliili's presence.

C. The First Judicial Controversy

Despite Lutali's continuing ownership of Lot B, both Pau and Mua, on one hand, and Tauiliili, on the other hand, used portions of Lot B. Tauiliili's use, however, was more extensive. He grew various crops, raised pigs, built a small house at the north end of Lot B, and maintained an *umu* ("stone oven site"). He also installed a septic tank system that serves an outside toilet on Lot A. Pau and Mua acquired Lot B in 1987 but tolerated Tauiliili's continuing use until 1990. Hurricane Ofa

destroyed the small house in 1990, and Tauiliili, with disaster assistance funds provided by the Federal Emergency Management Agency, undertook construction of a permanent house ("the FEMA house").

In 1990, Pau and Mua sued to stop construction of the FEMA house and to evict Tauiliili from Lot B. *See generally Faleatua v. Tauiliili*, 19 A.S.R.2d 122 (Land & Titles Div. 1991). The Court found that Pau and Mua owned Lot B. *Id.* at 125. Finding that he acted in bad faith with respect to the ownership of Lot B, the Court denied Tauiliili compensation for the value of his improvements, but allowed him to remove the improvements. *Id.* at 125-26. To avoid economic waste, however, the Court urged the parties to negotiate a sale of the completed FEMA house, but ordered that "[i]f such an agreement cannot be achieved, then Tauiliili shall remove the [FEMA] house and any other property of his on the land within 60 days or suffer such property to become a part of the realty." *Id.* at 126.

Tauiliili claims that Pau and Mua put off his efforts to negotiate a sale of the FEMA house by insisting that Patricia, their daughter then living outside American Samoa, must be involved. Pau lived in (Western) Samoa during most of this era, and Tauiliili maintains that this circumstance further impeded the negotiations. Tauiliili argues that the Court's order runs the 60-day period from the date the negotiations fail. The Faleatuas claim that Tauiliili never really approached them to negotiate a sale after the Court's order was entered, and that beginning 60 days thereafter, they owned the FEMA house and other improvements on Lot B.

In any event, the parties did not genuinely negotiate a sale of the FEMA house until 1996 when Patricia was visiting. However, they did not reach an agreement, and Tauiliili continued to use the FEMA house and his other improvements on Lot B. The Faleatuas did nothing substantial to prevent this use, until the present controversy fully erupted in 1999.

D. The Present Judicial Controversy

Unintentional preludes to the present controversy include:

(a) the survey of Lot J in December 1972 (the "original Lot J survey") by Mulivanu P.A. Tuaolo for the purchase of that lot by Pau and Mua for Patricia (Exhibit 1c);

(b) Aiumu's survey of Lot A in February 1973 ("the original Lot A survey") for the purchase of that lot by Tauiliili (Exhibit 1a);

(c) Aiumu's survey of Lot B in April 1987 ("the original Lot

B survey") for the purchase of that lot by Pau and Mua (Exhibit 1d);

(d) the resurvey of Lot B in March 1991 ("the first Lot B resurvey") by Semiti Tauai ("Tauai") prepared for the 1990 litigation between the parties (Exhibits 1e and 4); and

(e) the resurvey of Lot A and a survey of a 0.125 acre portion of Lot B around the FEMA house, designated Lot 1A, in December 1996 ("the first Lot A resurvey") by L.P. French ("French") for Tauiliili's possible purchase of Lot 1A from the Pau and Mua (Exhibit 2).

In 1997, Mua was convicted of embezzlement and ordered to make restitution of $52,000. *See Am. Samoa Gov't v. Faleatua*, CR No. 29-97, slip op. (Trial Div. Oct. 20, 1997). The Faleatuas contemplated sale or lease of Lot B, or portions of it, to help Mua comply with the order. They considered a sale of the land around the permanent house to Tauiliili as one option, or his removal from Lot B to pursue other options. The parties, however, were unable to reach agreement on the size of the area to be sold and the purchase price.

In February 1999, the Faleatuas began to install a fence along the common boundary between Tauiliili's Lot A and the Faleatuas' Lot J and Lot B. The fence is within the northern boundary of Lot J and Lot B claimed by the Faleatuas, but it is approximately 1.8 feet north of the southern boundary of Lot A claimed by Tauiliili at the west end and approximately 3.6 feet north of his boundary claim at the east end. During the installation, the Faleatuas damaged or destroyed a hedge of croton and various other plants that Tauiliili set after he acquired Lot A in 1973. Tauiliili values his loss at $760.00. Tauiliili then filed this action on February 10, 1999. He also removed the FEMA house from Lot B, with Pau's consent and within 60 days after he filed the present action.

Two additional resurveys to ascertain the common boundary between the Faleatuas' property and Tauiliili's property were made in preparation of the trial of this action:

(a) Aiumu's resurvey of Lot J and Lot B in August or September 1999 for the Faleatuas ("the Faleatuas common boundary resurvey") (Exhibit 7); and

(b) French's resurvey of Lot A in September 1999 for Tauiliili ("the Tauiliili common boundary resurvey") (Exhibit 3).

*1. The Boundary Issue*

Again, to simplify the discussion, we will identify relevant corners of the lots surveyed by the corner numbers and letters assigned in the surveys in evidence. Corners with numbers are as shown on the first Lot A resurvey. Identical corners with numbers and letters are as shown on the Tauiliili common boundary resurvey. The word "monument" is used generically to refer to boundary markers in the field at corners of surveyed land areas. Unless indicated otherwise, however, the monuments noted consist of a steel pin embedded in concrete.

*The original lot surveys.* The original Lot J survey, the original Lot A survey, the original Lot B survey, and the deeds each survey supports describe the boundary between Tauiliili's Lot A and the Faleatuas' Lot J and Lot B in the same manner ("the common boundary"). The common boundary is a straight line with corner 1 or 1A at the west end (shared by Lot A and Lot J), corner 4 or 4A at the east end (shared by Lot A and Lot B), and corner 5 or 5A at a midpoint (which is also the northeast corner of Lot J and the northwest corner of Lot B).

The parties agree that when the original Lot J survey and the original Lot A survey were completed in the early 1970s, monuments were located at each of the three corners. The professional surveyors now retained by the parties disagree, and hence the parties disagree, over the correct reconstruction of the original location of the three corners marking the common boundary. The surveyors' disagreement is at the heart of the present controversy.

*The first Lot B resurvey.* Tauai conducted the first Lot B resurvey (Exhibits 1e and 4) in March 1991 for the 1990 litigation between the parties. Tauai designated as "concrete monuments" on the first Lot B resurvey three monuments that he found in the field. These monuments were located at: corner 8, the southeast corner of Lot B; near corner 4, the then apparent northeast corner of Lot B; and corner 5, the approximate midpoint along the common boundary at the northwest corner of Lot B and the northeast corner of Lot J. The azimuths and distances in the first Lot B resurvey for the common boundary and the eastern boundary of Lot B shared with the airport are very close to those stated in the original Lot B survey (Exhibit 1d). The distance of the shared Lot B/airport boundary is of particular importance. Tauai recorded the distance at 255.49 feet, which is the identical distance stated in the original Lot B survey.

*The first Lot A resurvey.* When French conducted the first Lot A resurvey in December 1996 (Exhibit 2), he examined relevant deeds and surveys filed at the Territorial Registrar's Office and located relevant monuments in the field. French found monuments at: corner 3, the northeast corner of Lot A; corner 8; and corner 5. Because the monument was loose, he replaced the corner 5 monument. He did not

find monuments at corner 1, where the southwest corner of Lot A coincides with the northwest corner of Lot J, or at corner 2, the northwest corner of Lot A.

The boundary along the eastern sides of Lot A and Lot B between corner 3 and corner 8 is a straight line. French found a monument near where the coinciding point along this straight line at the southeast corner of Lot A and the northeast corner of Lot B should have been monumented. French extended the straight line between corner 5 monument and the monument near the coinciding point as a point on line ("POL") of the common boundary eastward and placed a monument at the coinciding point as corner 4. The POL monument is probably the monument identifying corner 4 as a result of the adjustments to Lot A in 1973, which Tauai found in 1991 and showed as the northeast corner of Lot B on the first Lot B resurvey. French then extended the common boundary between the same two points westward to the point where the missing monument at corner 1 or 1A should have been located, leaving 15 feet for the right of way (access road) between Lot A and Lot 8 reserved by the original Lot A survey and original Lot E survey. He placed a monument at the newly relocated corner 1.

Lot A is approximately a square. Thus, at the north end of Lot A, French extended a straight line at right angles from corner 3 to where the missing monument at corner 2 should have been located, again leaving 15 feet for the right of way between Lot A and Lot B. He placed another monument at the newly located corner 2.

French also testified, and his notes on the first Lot A resurvey reflect, that Tauiliili and Mua were present when the monuments at corner 5 and the POL were identified, and that both agreed that these monuments marked the common boundary. Mua denied that she agreed to French's field findings. Mua has been convicted of a crime of moral turpitude. We do not believe that French would compromise his professional integrity by knowingly recording false information. We therefore accept as factual his version of the persons present and their acceptance of the common boundary monuments found in December 1996. We doubt, however, that Mua truly understood the significance of her acquiescence to the location of the common boundary. We therefore do not give the fact of her acquiescence any weight in making our decision.

Monuments at two corners of Lot E are also significant to this discussion. Lot E lies west of Lot A, immediately beyond a 15 foot right of way reserved between the two lots. French found along the straight line eastern boundary a concrete post at corner 10, the southeast corner of Lot E, and a monument at corner 11, the northeast corner of Lot 8. The original Lot A survey and original Lot J survey indicate that the common boundary should be in a straight line with corner 10. However,

based on evidence in the field, French found that the common boundary was actually slightly south of the recorded common boundary. His finding forms the basis for the common boundary claimed by Tauiliili.

In this manner, French reconstructed the boundaries of Lot A for the first Lot A resurvey. The azimuths and distances set forth in the first Lot A resurvey are consistent with those set forth in the original Lot A survey (as corrected in the field with Lutali's consent in 1973 but not officially documented in a new survey). The boundaries in the first Lot A resurvey create an approximate 1.0 acre square. Likewise, the azimuths and distances set forth in the first Lot A resurvey for the common boundary are consistent with those set forth in the original Lot J survey and the original Lot B survey.

*The Faleatuas' common boundary resurvey.* In August or September 1999, Aiumu prepared the Faleatuas' common boundary resurvey (Exhibit 7) for trial of this action. Aiumu identified on the Faleatuas' common boundary resurvey four monuments that he found in the field. Using the first Lot A resurvey designations, these monuments were shown on the Faleatuas' common boundary resurvey and located at: corner 8, called the "ASG Monument"; corner 4 as monumented by French in 1996, called the "French Brass"; corner 3, called the "Tauiliili concrete monument"; and corner 10, called a "concrete post."

Aiunu reconstructed the common boundary by connecting a straight line from corner 10 to the point intersecting the straight-line boundary between corner 3 and corner 8 at a right angle. He then placed a new monument at the right angle junction to identify the northeast corner of Lot B and the southeast corner of Lot A. Aiumu apparently did not see or discounted the monuments that French replaced at corner 5, found at the POL, and placed at corner 4. The placement of Aiumu's new monument for the shared corner of Lot B and Lot A at the eastern end and use of corner 10 at the western end puts the common boundary slightly north of the common boundary delineated by French in December 1996. The placement forms the basis for the common boundary claimed by the Faleatuas. The Faleatuas' common boundary claim reduces the size of Lot A below 1.0 acre and increases the sizes of Lot J above 0.5 acre and Lot B above 0.649 acre.

Aiumu also stated in the Faleatuas common boundary resurvey that the distance of the eastern boundary of Lot B shared with the airport measured 251.85 feet and was recorded at 255.49 feet in the original Lot B survey, later in the first Lot B resurvey done by Tauai in 1991. However, Aiumu did not actually measure this distance when he conducted the Faleatuas Lot B resurvey in August or September 1999. Rather, he took this measurement from the first Lot A resurvey done by French in 1996.

*The Tauiliili common boundary resurvey.* In September 1999, after Aiumu did his resurvey work, French prepared the Tauiliili common boundary resurvey (Exhibit 3) for the trial. He found the monuments that, in 1996, he: placed at corner 2A; found at corner 3A, corner 8A, corner 10, and corner 11; found and replaced at corner 5A; and found at the POL. He also found the monument that Aiumu, when conducting the Faleatuas common boundary resurvey in 1999, placed to mark the coinciding southeast corner of Lot A and northeast corner of Lot B near French's corner 4A. The monuments that French placed at corner 1A and corner 4A in 1996 were missing. Only some remnants of the corner 4A monument were visible.

E. Analysis

*1. The Boundary Dispute*

 When a common boundary dispute arises, the deed controls if it is clear and unambiguous. *Koennicke v. Maiorano*, 682 A.2d 1046, 1053 (Conn. 1996). If the deed is ambiguous, the intent of the parties at the time of the original grant controls. *Id*; *see also United States v. 0.08246 Acres of Land*, 888 F. Supp. 693, 703 (E.D. Pa. 1995). In order to fix the location of the boundary lines when there are ambiguities, the court should attempt to harmonize all words and descriptions used in a grant and consider the surrounding circumstances. *Koennicke*, 682 A.2d at 1053. There is no serious dispute that inconsistencies in the grants render them ambiguous,[1] and both parties have attempted to use resurveys to show the proper location of the common boundary between Lot A and Lots B and J.

French and Aiumu utilized different monuments in their resurveys to determine the location of the common boundary, leading to differing conclusions as to its proper location. French used two monuments, one at corner 5 and one at the POL near corner 4, to determine the common boundary. The POL monument was likely the monument demarcating corner 4 after the correction in 1973 for the encroachment of the eastern boundary of Lot A onto the airport and on the first Lot B resurvey in 1991. French extended the line made by these two points to the east until it reached the eastern boundary of Lot A and Lot B, and extended it

---

[1] While magnetic north was historically used to reference bearings, more modern surveying techniques use celestial north [the North Pole]. CURTIS M. BROWN ET AL, BOUNDARY CONTROL AND LEGAL PRINCIPLES, 46-47 (4th ed. 1995). The modern method was put in place here by the grid system known as the American Samoa Datum of 1962. Some of the inconsistencies in the grants may have occurred as a result of reliance on the pre-1962 surveys of the airport and the differences in the two methods of surveying.

to the west until it was 15 feet from Lot B, the proper location of corner 1; Aiumu, in contrast, used corner 10, a point at the southeastern corner of Lot E on the same line as the common boundary, and drew a line to the east such that it would reach the eastern boundary of Lot A and Lot B at a 90 degree angle.

Both French's and Aiumu's resurveys match some descriptions in the grants but do not match others. French's first Lot A resurvey in 1996 sets the common boundary according to monuments on the boundary line, and the total acreage of the lots matches the grants. However, on this resurvey, corner 10 should be on the same line with the common boundary but is not. Furthermore, the length of the eastern boundary of Lot B measures 251.85 feet rather than the called length of 255.49 feet.[2] The Faleatua common boundary resurvey performed by Aiumu in 1999 Lot B resurvey correctly has a line eastward from corner 10 to the eastern boundary of Lot A and Lot B such that the lines meet at 90 degrees. However, Aiumu's resurvey fails to utilize monuments existing on the common boundary, so his identification of the boundary does not intersect them. It also changes the acreage of the lots from the original grants.

 In determining the boundary line when the calls are inconsistent, priority is to be given to calls in the following order: natural objects or landmarks first, then artificial monuments, then adjacent boundaries, and then courses and distances. *0.08246 Acres of Land*, 888 F. Supp. at 705-06 (general rule of construction used to create boundaries consistent with intention of parties); *Bollinger v. Hollingsworth*, 739 P.2d 962, 964 (Mont. 1987) (monuments generally prevail over courses and distances). A physical object is only a monument to be considered in determining boundaries when it is described in the deed description. *Milligan v. Milligan*, 624 A.2d 474, 748 (Me. 1993). Quantity of land is considered a relatively unreliable indicator, and should be resorted to only after courses and distances. *Koennicke*, 682 A.2d at 1053.

 While the first Lot A resurvey and the Tauiliili common boundary resurvey done by French and the Faleatuas common boundary resurvey done by Aiumu utilize monuments in the field, French's resurveys are superior because they reference monuments on the common boundary in the grants, rather than any monument located outside the boundary. Aiumu's resurvey uses corner 10, a corner not indicated in the grants of any of the lots at issue. French's resurvey utilizes the corners indicated in the grants: corner 5 and the POL monument are described in the grant

---

[2] The Faleatuas common boundary resurvey by Aiumu has this discrepancy as well. However, in preparing this survey, Aiumu apparently copied this length from French's first Lot A resurvey, so the actual length of Lot B as resurveyed by Aiumu in 1999 is unclear.

of Lot B; corner 5 is described in the grant of Lot J; and while the POL monument 4 was not utilized in the grant of Lot A because a revised deed was never recorded, it reflects a corner on the original resurvey that should have been included in a revised deed. Use of the monuments at corner 5 and the POL is therefore superior to use of the monument at corner 10, and the common boundary is properly located by extending the line made by connecting the monuments at corner 5 and the POL. The minor discrepancy in length between the called and found length of the eastern boundary of Lot B does not undermine this finding. By extending the line to the west as he did, French properly located corner 1 as a corner of Lot A.

 The parties' long acquiescence to the common boundary along the line made by corner 5 and the POL provides additional support to the finding that this is the correct boundary. Tauiliili placed croton along the part of this line abutting Lot J soon after he acquired Lot A in 1973, and had shrubbery along the boundary until the present dispute arose in 1999. Patricia has owned Lot J since 1973, but has never objected to this shrubbery until 1999. A clear line of plantings along a boundary line is strong circumstantial evidence of the boundary. *See Faleafine v. Suapilimai*, 7 A.S.R.2d 108, 112 (Land & Titles Div. 1988) (discussing line of tall coconut trees in itself as well as the parties' recognition of the line as the boundary). A party may definitively establish a boundary line by acquiescence if the acquiescence continues for long enough. Some courts require a set amount of time, and others simply require a long enough time so that the policy behind acquiescence is served. *See* 12 AM.JUR.2D *Boundaries* § 84 (1985). We do not need to determine precisely when acquiescence establishes a boundary; it is enough for the present purposes to state that the Faleatuas' acquiescence to Tauiliili's hedge for over 25 years evidences the parties' intention as to the true common boundary.

It appears that the POL monument was inadvertently placed slightly west of the intended eastern boundary of Lot A and Lot B, because it does not lie on the straight line between corner 3 of Lot A and corner 8 of Lot B. Some authority indicates that artificial monuments set at the time of an original survey are conclusive evidence of the location of the boundary lines as originally run. *Bollinger*, 739 P.2d at 963. These cases hold that artificial monuments set at the time of an original survey control the location of the boundary despite an error. *Id.*; *see also In re Arkansas Communities, Inc.*, 741 F.2d 185, 186 (8th Cir. 1984). However, we find that it makes more sense to correct minor errors in situations such as the one before us.

Locating the corner at corner 4 rather than at the POL makes the eastern boundary of Lot A and Lot B a straight line from corner 3 to corner 8. It also prevents gaps between Lot A and the airport and Lot B and the

airport. The two resulting triangular areas are small and isolated, and would be essentially useless for any development. Thus, the benefit gained by extending the common boundary to intersect the intended straight-line eastern boundary of Lot A and Lot B at corner 4 clearly outweighs any purpose served by placing this corner at the incorrectly marked POL location.

In sum, the common boundary, between Lot A on one side and Lot B and Lot J on the other, properly runs in a straight line, west to east, from the monument at corner 1 as set by French in 1996, through corner 5 and the POL monument, to corner 4 at the intersection of this line with the eastern boundary of Lot A and Lot B. Mutual permanent injunctions preventing further trespasses are appropriate.

*2. Contempt and Damages*

In their counterclaim, the Faleatuas assert that Tauiliili trespassed on their land for approximately eight years by failing to remove the FEMA house from their land despite an order from the Court in a previous dispute between the parties. In that dispute, the Court found that the land on which Tauiliili had the FEMA house belonged to the Faleatuas. *Faleatua*, 19 A.S.R.2d at 126. In order to prevent the substantial waste that would occur if Tauiliili removed the FEMA house from the land, the Court ordered the following:

> [T]he court strongly urges the parties to seriously attempt to negotiate a sale agreement of the said house. If such an agreement cannot be achieved, then Tauiliili shall remove the house and any other property of his on the land within 60 days or suffer the property to become a part of the realty.

*Id.*

The Faleatuas interpret this order to mean that the 60-day period began to run when the Court's order was issued on May 30, 1991. If this interpretation is correct, Tauiliili's failure to remove the house in this period means that the FEMA house belonged to the Faleatuas and that Tauiliili wrongfully remained on the land. Tauiliili, in contrast, argues that the Court's order means that the 60-day period for him to remove the FEMA house did not begin until the parties failed to reach an agreement on the sale of the house. Under this interpretation, Tauiliili did not need to remove the house until the parties finally failed to reach an agreement.

The Court probably intended for the 60-day period to begin to run immediately rather than to allow the dispute to continue indefinitely. However, we cannot say that Tauiliili's interpretation of the order is

unreasonable. Moreover, the parties negotiated for the sale of the property in 1996 when Patricia visited American Samoa, evidencing their belief that the FEMA house still belonged to Tauiliili at that time and its sale would be proper despite the Court's order. Tauiliili, with the Faleatuas' consent, even had the property resurveyed for a possible sale at that time. In light of the Faleatuas' continuing acquiescence to the presence of Tauiliili's house, Tauiliili may well have continued to believe that the parties could work out a sale of the house for the nine years between the previous court judgment and the present case. We therefore find that Tauiliili did not violate the Court's order in *Faleatua*, 19 A.S.R.2d 122, and that he is not in contempt of Court. However, Tauiliili trespassed on the Faleatuas' land. He not only failed to remove the house, but he continued to enter onto the land without the Faleatuas' express permission. *See Letuli v. Le'i*, 22 A.S.R.2d 77, 82 (Land & Titles Div. 1992) (discussing trespass generally). The Faleatuas are therefore entitled to damages for the trespass. *Id.*

F. Remedies

*1. Tauiliili's Hedge*

The Faleatuas destroyed a hedge of croton and other vegetation on Tauiliili's land, and Tauiliili is entitled to reimbursement for this loss. Tauiliili claims losses in the following amounts:

| | |
|---|---|
| Hedge of croton | $500.00 |
| Citrus trees | 50.00 |
| Breadfruit trees | 50.00 |
| Taamu plants | 20.00 |
| Red tea leaves | 20.00 |
| Top soil | 120.00 |
| Total | $760.00 |

Testimony on this loss was credible, and we find the total amount to be reasonable. We therefore set Tauiliili's compensatory damages against the Faleatuas at $760.00.

*2. Trespass on the Faleatuas' Land*

A party harmed as a result of a trespass is generally entitled to damages for: (1) diminution in value; (2) loss of use of the land; and (3) discomfort and annoyance to the occupant of the land. *Letuli*, 22 A.S.R.2d at 85 (citing RESTATMENT (SECOND) OF TORTS, § 929(1)). Tauiliili trespassed on the Faleatuas' land for nine years, but the Faleatuas acquiesced to this trespass. This fact indicates that the Faleatuas did not sustain much loss of use during this time and did not suffer great irritation. Furthermore, there is no evidence of diminution of

value. Under the circumstances of this case, an amount that offsets Tauiliili's damages for loss of the hedge is the reasonable measure of the Faleatuas' compensatory damages against Tauiliili for the trespass.

## 3. Punitive Damages

The parties have acted in a downright unneighborly fashion towards each other. However, neither side has been guilty of such reprehensible and outrageous conduct that would establish a basis for punitive damages.

## 4. The Faleatuas' Fence

Tauiliili is entitled to have all parts of the fence installed by the Faleatuas removed from his land.

## Order

1. The common boundary between Tauiliili's Lot A and the Faleatuas' Lots B and J runs, from west to east, from corner 1, through corner 5 and the POL, to corner 4.

2. Tauiliili, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them are permanently enjoined from trespassing on the Faleatuas' Lot B and Lot J. The Faleatuas, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them are permanently enjoined from trespassing on Tauiliili's Lot A.

3. Tauiliili and the Faleatuas are each entitled to damages in the amount of $760.00. However, in view of the offsetting amounts, neither Tauiliili nor the Faleatuas are required to pay the assessed damages.

4. The Faleatuas shall, within 60 days after this order issues, remove all parts of the fence that they erected just prior to this lawsuit that encroach on Tauiliili's land as stated in this order. If the Faleatuas fail to remove the fence, Tauiliili is entitled to remove it if he chooses to do so and to salvage the materials as compensation for his cost of removal.

It is so ordered.