2011 ME 134

**Lewis E. MATTESON et al.**

v.

**Malcolm L. BATCHELDER.**

Supreme Judicial Court of Maine.

Argued: April 12, 2011.
Decided: Dec. 22, 2011.

Edmond J. Bearor, Esq. (orally), and Jesse A. Boyd, Esq., Rudman & Winchell, LLC, Bangor, on the briefs, for appellants Lewis E. Matteson and Betty J. Matteson.

William B. Devoe, Esq. (orally), and Mark D. Beaumont, Esq., Eaton Peabody, Bangor, on the briefs, for appellee Malcolm Batchelder.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SILVER, J.

[¶ 1] This case involves a dispute over fee ownership of less than one acre of land on a stream in Exeter and the location of a deeded right-of-way on property owned by Lewis E. Matteson and Betty J. Matteson. Following a bench trial in the Superior Court (Penobscot County, *Murphy, J.*), the Mattesons appealed the decision regarding the right-of-way, and Malcolm Batchelder cross-appealed the decision regarding fee ownership of the disputed lot. We affirm the court's judgment as to the fee ownership issue, but we vacate the judgment regarding the right-of-way and remand for further proceedings.

## I. BACKGROUND

[¶ 2] It is undisputed that at the time of trial, Batchelder owned an interest in land on the south side of French Stream, which is referred to as Kenduskeag Stream on the deed, at a dam where the stream intersects with Stetson Road. The Mattesons owned land along the north side of the stream, just upstream from the dam. Historically, the land on either side of the stream at the dam and just downstream from the dam comprised a one-acre lot that was used as a mill and referred to as a "mill lot." The land on the northern side of the stream, comprising the northern half of the mill lot, is the portion of that lot that is the subject of the fee ownership dispute.

[¶ 3] The Mattesons originally filed suit against Batchelder after he renovated the dam. Batchelder testified at trial that he rebuilt the dam to raise the water level and thereby provide water frontage for a camp he owned about a mile upstream. The Mattesons sought a declaratory judgment that Batchelder did not have the right to flood their property and an injunction to prohibit Batchelder from impounding the water. Batchelder asserted a counterclaim for a judgment declaring that he owns the disputed portion of the mill lot in fee and additionally that he has an interest in a deeded right-of-way across the Mattesons' land. The court appropriately determined that the Mattesons' declaratory judgment claim and request for

an injunction was subsumed by Batchelder's counterclaim. Only the counterclaim is at issue in this appeal.

[¶ 4] To address Batchelder's argument regarding fee ownership of the disputed portion of the mill lot, it is necessary to trace the chain of title back to the 1930s. Batchelder's maternal grandfather, Lester French, owned a 120–acre parcel, part of which eventually became the Mattesons' property. French also owned the mill lot. In 1933, the Town of Exeter took French's 120 acres in a tax foreclosure proceeding. In 1935, the Town issued a tax lien on the mill lot. In 1936, the Town sold the 120–acre property to Ernest Stevens. In 1937, the Town discharged the tax lien and French recovered the mill lot.

[¶ 5] In 1943, Stevens sold thirty-five acres of the 120–acre property to French. The deed from Stevens to French contained the following property description:

Located in Range five, Lots seven and eight, containing about thirty-five acres more or less [bounded] on the North by Exeter town farm; on the east by Star Route Exeter to Stetson; on the Southwest by Kenduskeag Stream, On the west by land of L.S. French.

This property description was immediately followed by a reference to the 1936 deed from the Town to Stevens:

Being part of real estate deeded to me by the inhabitants of the town of Exeter by quit claim deed dated July 20th[,] 1936[,] and recorded in Penobscot Registry of Deeds Vol. 1115[,] Page 201.

[¶ 6] Batchelder's parents, Geraldine and Dennis Batchelder, eventually gained ownership of both the thirty-five-acre parcel and the mill lot. In 1986, they conveyed the thirty-five-acre parcel to Joanne Jackson and Byron Jackson, who conveyed it a couple of months later to Wanda Dearborn and Tony Dearborn. Both of those deeds used the same property description

that Stevens used in the 1943 deed to French, changed only to reflect changes in the ownership of the abutting properties. Both deeds also included the reference to the 1936 deed from the Town to Stevens.

[¶ 7] The 1986 deed from Geraldine and Dennis Batchelder to the Jacksons is the first in the chain of title to reserve the right-of-way at issue in this appeal. The right-of-way was intended to provide access to a five-acre parcel reserved from the westerly end of the property. The five-acre parcel is described as follows:

Excepting and Reserving a certain lot or parcel of land of five acres from the Westerly end of the above described lot. Said lot being bordered on the north by the south line of the Town Farm Lot, on the West and South by the Kenduskeag Stream and on the Easterly by a line running from the Town Farm Lot in a Southerly direction far enough in the Easterly direction from the Westerly line (Kenduskeag Stream) to comprise 5 acres.

The right-of-way is described as follows:

Also Excepting and Reserving herefrom a fifty (50') foot right-of-way to be used for all purposes of a way over and on the above described premises. The said right-of-way to follow within fifty (50') feet Northerly of the Northerly shoreline of the Kenduskeag Stream to the Easterly line of the above Reservation.

[¶ 8] In 1993, the Dearborns conveyed to the Mattesons a 12.2–acre parcel that had comprised the southeastern corner of the Dearborns' thirty-five-acre parcel. The 1993 deed described the Mattesons' property by metes and bounds and reserved the same right-of-way that first appeared in the 1986 deed from Geraldine and Dennis Batchelder to the Jacksons.

[¶ 9] A bench trial was conducted in December 2009. In June 2010, the court entered its findings on the fee ownership

of the disputed parcel, concluding that the Mattesons owned the northern portion of the mill lot. The court then gave the parties additional time to provide supplemental arguments regarding the location of the easement, including but not limited to whether the deed is ambiguous or the parties made a mutual mistake of fact with respect to the location of the right-of-way.

[¶ 10] In September 2010, the court entered its order regarding the right-of-way. The court found that the deed description of the right-of-way was ambiguous for two reasons. First, it did not account for stream water levels that fluctuate both seasonally and annually. The court found that due to changing water levels, it would be "nearly impossible" to locate and use the right-of-way as described in the deed. Second, Malcolm Batchelder historically gained access to the five-acre parcel by using a field road that crossed the Mattesons' property in an area outside the deed description of the bounds of the right-of-way. The court reformed the deed to locate the easement along the field road.

## II. DISCUSSION

### A. Fee Ownership of the Disputed Portion of the Mill Lot

[¶ 11] Batchelder asserts that Geraldine and Dennis Batchelder did not intend to convey the northern half of the mill lot to the Jacksons in 1986, and therefore the Jacksons' successors-in-title, including the Mattesons, did not obtain title to it. Batchelder concedes that the property description in the 1986 deed includes the northern half of the mill lot. However, he argues that because the property description is followed by the reference to the 1936 deed, and because the 1936 deed did not include the mill lot, the reference to the 1936 deed reflected the parties' intent to diminish the size of the parcel conveyed in the 1986 deed by eliminating the northern half of the mill lot.

[¶ 12] The standard of review is de novo as to the interpretation of a deed and clear error as to questions of fact. *See Snyder v. Haagen,* 679 A.2d 510, 513 (Me.1996). As the Superior Court determined, there are two salient facts regarding the intent of Geraldine and Dennis Batchelder to convey the northern half of the mill lot. First, they owned both the thirty-five-acre parcel and the mill lot in 1986 when they conveyed to the Jacksons, and therefore they were able to include the northern half of the mill lot when they conveyed the thirty-five-acre parcel. Second, the property description in the 1986 deed from Geraldine and Dennis Batchelder to the Jacksons bisects what was historically the mill lot and unambiguously includes the northern half of the mill lot. We have held that a reference in a deed to another deed will not limit the amount of land otherwise unambiguously conveyed by the property description. *Sabasteanski v. Pagurko,* 232 A.2d 524, 526 (Me.1967). The court did not err in finding that Geraldine and Dennis Batchelder intended to convey the northern half of the mill lot when they conveyed the thirty-five-acre parcel to the Jacksons in 1986 and that consequently their successors-in-title obtained the property included in the deed's property description.

### B. The Right–of–Way

[¶ 13] Batchelder based his claim to the right-of-way on an alleged 1990 deed that conveyed to him and Kathy Batchelder two real property interests: the right-of-way and the five-acre parcel to which the right-of-way provided access. The 1990 deed does not appear to be part of the evidentiary record. The Superior Court found that it would be "highly impractical" to require Batchelder to scale the dam or walk through flooded woodland "every time he seeks to access the 5–acre parcel reserved by the 1986 conveyance,"

and referred to Batchelder's "access to the 5–acre reservation." Throughout Batchelder's appellate brief he also suggests that at the time of filing of the brief he owned the five-acre parcel and that this ownership forms the basis of his property interest in the right-of-way. However, during oral argument, Batchelder represented that he formerly owned the five-acre parcel but conveyed it at some point to a third party.

[¶ 14] The issue of whether Batchelder has a property interest in the right-of-way may be jurisdictional due to the law regarding easements. "An easement appurtenant is created to benefit the dominant tenement and runs with the land." *O'Donovan v. McIntosh*, 1999 ME 71, ¶ 7, 728 A.2d 681. The Restatement states with respect to the issue of standing to assert a claim to a servitude:

> Only current beneficiaries are entitled to seek judicial enforcement of servitudes. Persons who are not beneficiaries and former beneficiaries who have lost their interest in a servitude by transfer, or otherwise, are not entitled to sue to enforce servitudes, even if enforcement would be beneficial to them, individually, or as property owners.

Restatement (Third) of Property: Servitudes § 8.1 cmt. b (2000). "[S]tanding relates to the court's subject matter jurisdiction and may be raised at any time, including during an appeal." *JPMorgan Chase Bank v. Harp*, 2011 ME 5, ¶ 7, 10 A.3d 718. A court may address jurisdiction on its own motion. *Francis v. Dana–Cummings*, 2007 ME 16, ¶ 20, 915 A.2d 412.

[¶ 15] We leave it to the Superior Court on remand to determine in the first instance what Batchelder's property interest in the right-of-way was during the pendency of this litigation and what, if any, bearing these issues have on this litigation. For the sake of judicial economy, however, we assume for now that, at the time of trial, there was a basis for Batchelder's claim to the deeded right-of-way over the Mattesons' property.

[¶ 16] A right-of-way is a form of easement. *Black's Law Dictionary* 586 (9th ed. 2009). "What the boundaries are, as ascertained from the deed, is a question of law," whereas "[w]here boundaries are on the face of the earth is a question of fact." *Snyder*, 679 A.2d at 513; *accord Proctor v. Hinkley*, 462 A.2d 465, 469 (Me. 1983). "The scope of a party's easement rights must be determined from the unambiguous language on the face of the deed. Only if language in a deed is ambiguous may a court consider extrinsic evidence to determine the intent of the parties." *Jordan v. Shea*, 2002 ME 36, ¶ 14, 791 A.2d 116 (citation omitted). Extrinsic evidence may include "the circumstances existing at the time of the making of the deed or the contemporaneous construction of the deed by the grantee or grantor." *Snyder*, 679 A.2d at 513. "In the absence of extrinsic evidence, the intent of the parties should be ascertained by resort to the rules of construction of deeds, such as the familiar rule that boundaries are established in descending order of control by monuments, courses, distances and quantity." *Id.*

[¶ 17] The 1986 deed from Geraldine and Dennis Batchelder to the Jacksons states that the right-of-way was "to follow within fifty (50') feet Northerly of the Northerly shoreline of the Kenduskeag Stream." This deed unambiguously establishes the shoreline as a monument. *See* Knud E. Hermansen & Donald R. Richards, *Maine Principles of Ownership Along Water Bodies*, 47 Me. L.Rev. 35, 48 (1995) (cited in *Snyder*, 679 A.2d at 514). The court erred in reforming the deed to reflect a new location of the easement along the field road; there was no mutual mistake of fact that anything other than

the shoreline was the boundary, as described in the deed. *See Jordan,* 2002 ME 36, ¶ 18, 791 A.2d 116 ("Reformation is an equitable remedy by which an instrument may be corrected when a mistake is discovered so as to reflect the real intention of the parties."); *Moulton v. Moulton,* 1998 ME 31, ¶ 9, 707 A.2d 74. It is irrelevant that Batchelder historically used the field road to access the reserved five-acre parcel to the extent he bases his claim on the language of the deed.

[¶ 18] Although the deed is unambiguous in establishing a shoreline boundary, the use of the term "shoreline" without more is insufficient to fix the boundary because (1) that term may refer to either the high-water mark or the low-water mark, *see Snyder,* 679 A.2d at 514; and (2) the high-water mark or low-water mark must itself be precisely located on the ground, *see Proctor,* 462 A.2d at 469–70 & n. 4. We have held that

> the word "shore" is equivalent to the term "bank" when used in conveyances of property that border fresh water. The term "bank" refers to the sloped edge of a body of water, and it may or may not include the low water mark. In interpreting a deed that uses the word "bank" or, as here, the word "shore," it is necessary to determine whether the deed conveys to the low or high water mark.

*Snyder,* 679 A.2d at 514 (citations omitted); *see also Milligan v. Milligan,* 624 A.2d 474, 476 (Me.1993) (referring to the "shoreline" in a discussion in which a deed uses the term "shore"). We have also held that the use of the term "shore" is inappropriate for most nontidal water bodies, but that term may be clarified by other terms in the deed:

> A reference to the "shore" is inappropriate for most nontidal bodies of water. Technically speaking, the "shore" refers to the ground alternatively covered and exposed by the flow and ebb of the tide, the flats between the ordinary high and low water mark. In general, when the term is applied to nontidal bodies of water, it is synonymous with the term "bank." The reference to "bank" in a deed may be limited by other calls to [the] ordinary high-water mark or it may include to the low-water mark. Whether the deed conveys the flats or bed adjacent to the bank of a body of water, tidal or nontidal, must be determined by deciding from the terms of the deed whether they are intended to be included or excluded.

*Proctor,* 462 A.2d at 473 n. 6 (citations omitted) (quotation marks omitted). In this case, the deed describes the "Northerly shoreline of the Kenduskeag Stream" as the southerly boundary of the fifty-foot-wide easement. Because the high-water mark of the Kenduskeag Stream is the most northerly portion of the northerly shoreline, and the high-water mark is always included when a deed refers to a "bank," "shore," or "shoreline" as a boundary, the high-water mark is the boundary. The low-water mark cannot be the boundary under the plain language of the deed.

[¶ 19] To identify the location of the northerly shoreline on the ground, the court must consider extrinsic evidence in addition to the language of the deed. *See Jordan,* 2002 ME 36, ¶ 14, 791 A.2d 116; *Snyder,* 679 A.2d at 513. The court found that the water level fluctuates both seasonally and annually, and the parties presented conflicting evidence regarding where the shoreline was in 1986. The only trial expert was the Matteson's professional land surveyor, who testified that the shoreline in 1986 may have been approximately where an iron rod was placed as a monument in conjunction with the 1993 deed.

[¶ 20] In a jury-waived trial, it is the province of the trial court to resolve

 

conflicting evidence. *State v. Whitmore*, 540 A.2d 465, 466 (Me.1988). On remand, if the court reaches this issue it must make a finding of the location of the northerly shoreline on the face of the earth, and it may exercise its sound discretion as to whether to base that finding on the existing record or on additional evidence. *See Flaherty v. Muther*, 2011 ME 32, ¶ 72 n. 13, 17 A.3d 640.

[¶ 21] In addition to claiming an interest in the right-of-way by deed, Batchelder's alternate theory of the case is that he obtained an interest through the doctrine of boundary by acquiescence. One of the requirements for a claim of boundary by acquiescence is a possessory interest in the land along the boundary. *See Hamlin v. Niedner*, 2008 ME 130, ¶ 7, 955 A.2d 251. The doctrine of boundary by acquiescence is not applicable to rights-of-way because they, like easements generally, are nonpossessory interests in land. *See Town of Waltham v. PPL Maine, LLC*, 2006 ME 88, ¶ 9, 901 A.2d 816; *Black's Law Dictionary* 586 (9th ed. 2009).

[¶ 22] We remand for the court to determine whether Batchelder had at the time of trial and continues to have a property interest in the right-of-way such that he has standing to bring this claim. If Batchelder does have standing, the court must determine where the right-of-way is located on the face of the earth by locating the northerly shoreline boundary of the right-of-way based either on the existing record or on additional evidence.

The entry is:

Judgment affirmed in part and vacated in part. Judgment affirmed in favor of the Mattesons with respect to Batchelder's claim of fee ownership of the northern half of the mill lot. Judgment vacated and remanded for further proceedings consistent with this opinion with respect to Batchelder's claim of an interest in the right-of-way.